[No. D032261. Fourth Dist., Div. One. Mar. 16, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
HUGO SANDOVAL GARCIA, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III, IV, V.

**COUNSEL**

David M. McKinney, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, and Frederick B. Clark, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**McINTYRE, J.**—After a trial in which he elected to represent himself, a jury convicted Hugo Sandoval Garcia of first degree murder (count 1) and

willful, deliberate and premeditated attempted murder (count 2), and found he had personally used a firearm in committing both offenses and had inflicted great bodily injury on the surviving victim. Garcia was sentenced to a total of 54 years in prison, consisting of 25 years to life for first degree murder, a consecutive term of 15 years to life for premeditated attempted murder, plus a four-year firearm enhancement on count 1 and a 10-year firearm enhancement on count 2.

Garcia appeals, contending (1) there is insufficient evidence of premeditation and deliberation to sustain his conviction of first degree murder; (2) the trial court committed reversible error in failing to appoint advisory counsel to assist him; (3) the prosecutor committed misconduct (a) when he told the jury to show Garcia as much mercy as he showed his victim, (b) in commenting on Garcia's failure to testify, and (c) by misrepresenting the legal principles of premeditation and deliberation; (4) the trial court committed reversible error in failing to instruct the jury with CALJIC No. 8.31 on implied malice second degree murder; and (5) the trial court wrongly imposed a sentence of 15 years to life for premeditated attempted murder, because the correct sentence for this offense is life with the possibility of parole.

In the published portion of this opinion we determine that there is sufficient evidence to sustain Garcia's conviction of first degree murder and that the trial court did not err in failing to appoint advisory counsel. In the unpublished portion, we reject Garcia's third and fourth contentions, but agree with his fifth. Accordingly, we modify the judgment such that Garcia's sentence on count 2 is life with the possibility of parole plus the 10-year firearm enhancement. The judgment is affirmed in all other respects.

## FACTUAL AND PROCEDURAL BACKGROUND

Garcia was born and raised in Mexico, where he completed ninth grade. He is able to read and write in Spanish, but does not speak or write English. Prior to his trial, Garcia moved to substitute his appointed counsel. When this motion was denied, Garcia indicated that he wished to represent himself, with an interpreter. The trial court thoroughly explained the risks involved in such an endeavor and Garcia stated he understood the risks and wished to represent himself; he also requested an investigator to assist him. The court again explained the risks as well as the responsibilities of self-representation, and Garcia confirmed that he wanted to "be the attorney by [himself]." The court then granted Garcia's request to waive his right to counsel and represent himself, and appointed him an investigator.

At trial, the prosecution witnesses established that on September 29, 1997, Garcia shot and killed Armando Chiquete and critically wounded his cousin,

Jose Peraza. Garcia owed Chiquete money relating to an earlier marijuana transaction, and before the day of the murder, Peraza had twice driven Chiquete to Garcia's apartment complex, where Chiquete and Garcia discussed the debt. Chiquete and Garcia did not argue during these encounters, nor did Chiquete bring any weapons or threaten Garcia.

Garcia's debt remained unpaid, and on September 29, 1997, Peraza drove Chiquete over to Garcia's apartment complex so that Chiquete could talk to Garcia again. It was a hot day, so Chiquete had taken off his shirt and slung it over his shoulder, leaving him bare-chested. He was not carrying any weapons. Chiquete got out of the car, and he and Garcia started talking to each other; there was no indication that they were arguing or that either one was agitated or upset. Chiquete had his hands down at his side and Peraza saw him make a quick side step. Garcia then brought his hand up toward Chiquete's head and Peraza saw Chiquete fall immediately to the ground. In addition, a passerby heard a "pop," saw the shooter holding a handgun straight out in front of his body, and the victim drop to the ground. After he shot Chiquete, Garcia started running toward Peraza, who ran across the street in the opposite direction. Garcia chased Peraza and shot him in the back, seriously wounding him.

Chiquete died from a single .9-millimeter gunshot wound to the chest. The bullet severed his pulmonary artery and destroyed his aorta—the main blood vessel coming from his heart; the bullet then went through Chiquete's backbone and severed his spine. The gun powder stippling on Chiquete's chest indicated that he was shot from within two to four feet away—most likely from within two feet.

Garcia fled to Mexico after the shootings. On September 30, 1997, he called his former mother-in-law and told her he had killed one man and shot another. Garcia gave a variety of reasons for killing Chiquete—that it was because his ex-wife did not pay enough attention to him, that it was over drugs and money and it was "either his life or theirs," and because Chiquete had killed one of his cousins.

During the trial, Garcia conducted very limited cross-examination of witnesses. Although he took the stand in his defense, he did not give any testimony or present evidence. Rather, he attempted to argue against the evidence that had been presented by the prosecution, as follows: "Well, I would like to say where are the witnesses that showed up. They were saying that this shot was on the side like this. If one shoots in the front like this, like they are saying, that shot can get you on the side like this and come out on this side."

The court explained to Garcia that this was his opportunity to testify to anything within his personal knowledge, and that he would have the opportunity to argue to the jury later in the trial. Garcia then indicated that he wished only to argue. The court further explained the difference between the two concepts, and Garcia confirmed that he did not want to give testimony, but wanted to argue. Garcia did not call any additional witnesses. In his closing statement, Garcia argued that the proof against him was "[j]ust a shell," that many of the witnesses did not identify him, and that he was not the person they had seen at the murder scene.

## DISCUSSION

### I

### *Garcia's Conviction of First Degree Murder Is Supported by Substantial Evidence*

 Garcia contends the record does not contain sufficient evidence of premeditation and deliberation to sustain a verdict of first degree murder. We disagree.

 In reviewing the sufficiency of the evidence of premeditation and deliberation, we assess whether the evidence supports an inference that the killing occurred as the result of preexisting reflection, as opposed to an unconsidered or rash impulse. (*People v. Pride* (1992) 3 Cal.4th 195, 247 [10 Cal.Rptr.2d 636, 833 P.2d 643].) We do not substitute our judgment for that of the jury. Rather, we must draw all inferences in support of the verdict that can reasonably be deduced and must affirm the judgment if, after viewing all the evidence in the light most favorable to the prosecution, any rational jury could find premeditation and deliberation beyond a reasonable doubt. (*Ibid.*; see also *People v. Perez* (1992) 2 Cal.4th 1117, 1124 [9 Cal.Rptr.2d 577, 831 P.2d 1159].)

Pertinent categories of evidence bearing on premeditation and deliberation are (1) planning activity; (2) motive; and (3) manner of killing. (See *People v. Anderson* (1968) 70 Cal.2d 15, 27 [73 Cal.Rptr. 550, 447 P.2d 942].) However, these factors need not all be present, or in any special combination; nor must they be accorded a particular weight. (*People v. Pride, supra,* 3 Cal.4th at p. 247.) Rather, the *Anderson* factors serve as an aid to reviewing courts in assessing whether the killing was the result of preexisting reflection. (*People v. Perez, supra,* 2 Cal.4th at p. 1127.) Finally, it is important to keep in mind that deliberation and premeditation can occur in a brief period of time. "The true test is not the duration of time as much as it

is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." (*People v. Thomas* (1945) 25 Cal.2d 880, 900 [156 P.2d 7].)

 Here, there is substantial evidence that Garcia's murder of Chiquete was deliberate and premeditated, rather than the result of an unconsidered or rash impulse. First, there is ample evidence of motive. Garcia owed Chiquete money relating to a marijuana deal, and Chiquete had spoken to him twice about it, but Garcia had not paid. When Chiquete spoke to him about the debt a third time, Garcia killed him. The manner and circumstances of the killing also indicate that it was the result of preexisting reflection. There was no history of threats or violence by Chiquete, nor was he armed on any of the previous occasions he had spoken to Garcia about repaying the money owed. When Chiquete went to speak with Garcia on the day he was killed, he again was unarmed and wearing only a pair of pants—making it impossible to carry or conceal a weapon in his waistband, under his shirt, in a jacket, etc. Chiquete and Garcia did not argue or raise their voices. Yet, while Chiquete was standing with his hands down at his sides, Garcia pulled out a loaded, .9-millimeter handgun, held it straight out in front of his body and shot Chiquete through the heart from close range. This was an unprovoked and "particular and exacting" killing from which the jury could infer deliberation and premeditation. (See *People v. Caro* (1988) 46 Cal.3d 1035, 1050 [251 Cal.Rptr. 757, 761 P.2d 680].) Accordingly, we conclude there is sufficient evidence to sustain the jury's finding of first degree murder. (*Id.* at pp. 1050-1051; *People v. Miranda* (1987) 44 Cal.3d 57, 86-87 [241 Cal.Rptr. 594, 744 P.2d 1127], disapproved of on other grounds in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4 [269 Cal.Rptr. 269, 790 P.2d 676].)

II

*The Court Did Not Err in Failing to Appoint*
*"Advisory Counsel" for Garcia*

 Garcia admits that he knowingly, voluntarily and competently waived his right to counsel after being duly warned of the consequences. (See *Godinez v. Moran* (1993) 509 U.S. 389, 400-401 [113 S.Ct. 2680, 2687, 125 L.Ed.2d 321]; *Faretta v. California* (1975) 422 U.S. 806, 835-836 [95 S.Ct. 2525, 2541, 45 L.Ed.2d 562] (*Faretta*).) However, he contends he was incompetent in presenting a defense, and thus his convictions must be reversed, because the court did not appoint "advisory counsel" to assist him. He maintains that appointment of an advisory counsel is compelled under *People v. Bigelow* (1984) 37 Cal.3d 731 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723] (*Bigelow*), in which a Canadian with a ninth grade

education faced a capital murder trial. We disagree and decline to extend *Bigelow* to noncapital cases.

In *Bigelow*, the trial court denied the defendant's request for advisory counsel, holding that California law did not permit advisory counsel. (*Bigelow, supra,* 37 Cal.3d at pp. 740, 742.) After representing himself in both the guilt and penalty phases of the trial, the defendant was convicted and sentenced to death. The California Supreme Court reversed his conviction, holding the trial court did have the discretion to appoint advisory counsel, *and further,* that under the circumstances of the case, it would have been an abuse of discretion to refuse the request for advisory counsel. (*Id.* at p. 743.) In so holding, the court stressed that the case involved the death penalty, which "affects the standard by which the court should evaluate [the defendant's] request" because " 'death is a different kind of punishment from any other, both in terms of severity and finality.' " (*Id.* at 743, fn. 7, quoting *Keenan v. Superior Court* (1982) 31 Cal.3d 424, 430 [180 Cal.Rptr. 489, 640 P.2d 108].) The court also noted that capital cases raise complex legal and factual issues beyond those raised in an ordinary trial. In particular, the case before it arose under the 1978 death penalty initiative, "an enactment rife with constructional and constitutional difficulties, which had not yet been judicially interpreted." (*Bigelow, supra,* 37 Cal.3d at p. 743.) The court concluded that given the defendant's limited education, foreign nationality and unfamiliarity with California law, he was "not competent to defend a capital case." (*Id.* at pp. 743-744.)

We are unwilling, without specific direction from our Supreme Court, to extend *Bigelow* to the instant noncapital case. We recognize that a noncapital first degree murder case is in the next most serious category of criminal offenses. However, such a case does not entail the punishment of death, which the *Bigelow* court emphasized requires a different standard with regard to appointing advisory counsel. This case also does not involve the complex legal and factual issues attending a death penalty case. Indeed, there was no dispute that Garcia shot and killed Chiquete from close range and then chased down Peraza and shot him in the back, gravely wounding him. The only issue was his intent, which was not an overly complex matter—either legally or factually. Moreover, to hold in this case that the court abused its discretion in failing to appoint advisory counsel absent a request for one, would result in a rule that courts have a sua sponte duty to appoint advisory counsel in all murder or very serious cases (or even less serious cases depending on where the line is drawn) involving an unsophisticated defendant, who nevertheless wishes to represent himself. We are opposed to creating such a rule.

Indeed, we respectfully disagree with the portion of the *Bigelow* opinion that goes beyond confirming the right of courts to appoint advisory

counsel and holds that a trial court can abuse its discretion in *failing* to do so. In *Faretta,* the Supreme Court affirmed the *power* of trial courts to appoint advisory or stand-by counsel, even over the objection of the accused, to advise the accused should he request help, to be available to take over representation if necessary, and/or to relieve the trial judge of the need to explain and enforce basic rules of courtroom procedure. (*McKaskle v. Wiggins* (1984) 465 U.S. 168, 184 [104 S.Ct. 944, 954, 79 L.Ed.2d 122] (*McKaskle*); *Faretta, supra,* 422 U.S. at pp. 834-835, fn. 46 [95 S.Ct. at p. 2541].) Similarly, the California Supreme Court held in *People v. Mattson* (1959) 51 Cal.2d 777, 797 [336 P.2d 937], that a court *may*, in its discretion, appoint counsel to "render . . . advisory services" to a defendant who wishes to represent himself, in order to promote orderly, prompt and just disposition of the cause. The concern of these courts was the risk of violating the right to self-representation that is posed by appointment of advisory counsel, as balanced against the power and necessity of trial courts to control the proceedings before them. (See *McKaskle, supra,* 465 U.S. at pp. 176-177, 183-184 [104 S.Ct. at p. 950]; *Faretta, supra,* 422 U.S. at pp. 834-835, fn. 46 [95 S.Ct. at p. 2541]; *People v. Mattson, supra,* 51 Cal.2d at p. 797.)

We believe that in *Bigelow,* the right of trial courts to appoint advisory counsel as part of their power to control proceedings was incorrectly transformed into the right of defendants who have elected to represent themselves to nevertheless have advisory or stand-by counsel in certain circumstances. This is the effect of holding that a court can abuse its discretion or otherwise commit reversible error in *not* appointing advisory counsel. However, a defendant who elects to represent himself or herself has no constitutional right to advisory or stand-by counsel or any other form of "hybrid" representation. (*McKaskle, supra,* 465 U.S. at p. 183 [104 S.Ct. at p. 953]; *People v. Bloom* (1989) 48 Cal.3d 1194, 1218 [259 Cal.Rptr. 669, 774 P.2d 698].) Indeed, the Supreme Court in *McKaskle, supra,* 465 U.S. at page 183 [104 S.Ct. at page 953], specifically stated "*Faretta* does not require a trial judge to permit 'hybrid' representation[.]"

The Supreme Court in *McKaskle* and *Faretta* also made clear that a defendant who exercises his right to represent himself cannot later complain that the quality of his defense amounted to a denial of the effective assistance of counsel. (*McKaskle, supra,* 465 U.S. at p. 177, fn. 8 [104 S.Ct. at pp. 950-951]; *Faretta, supra,* 422 U.S. at pp. 834-835, fn. 46 [95 S.Ct. at p. 2541].) This rule is entirely eviscerated when a defendant is allowed to challenge a verdict on the ground that he or she was not provided with advisory or stand-by counsel. To permit such a challenge is to allow a defendant to complain that because of the poor quality of his self-representation, he was improperly denied effective assistance of counsel in the form

of a hybrid representation. Indeed, here, Garcia describes at length the poor quality of his own defense, and then maintains that because of his "incompetentcy in presenting any defense whatsoever," the court committed reversible error in not appointing advisory counsel "to assist [him] in his pro per status." We submit that such a challenge is not permitted under *McKaskle* and *Faretta*.

There remains an unresolved conflict between self-representation under *Faretta* and a competent defense against the charges. In reality, the concept of advisory counsel for the *Faretta* defendant is disingenuous. *Faretta* gives the pro se defendant the right to control the presentation of his case, and a defendant who represents himself does so voluntarily and knowingly, and only after being warned of the risks, responsibilities and consequences of his decision and expressly relinquishing the benefits associated with being represented by counsel. (*Faretta, supra,* 422 U.S. 834-835 [95 S.Ct. at p. 2541]; see also *McKaskle, supra,* 465 U.S. at p. 178 [104 S.Ct. at p. 951].) The *Bigelow* notion of advisory counsel appears to be aimed at tempering the consequences and risks the defendant voluntarily assumed in order to represent himself and be in control of his defense. However, this belies the concept of *self-representation* referred to in *Faretta* and cases following, and results in ad hoc, joint representation or "self-representation-plus." (See *Brookner v. Superior Court* (1998) 64 Cal.App.4th 1390, 1396 [76 Cal.Rptr.2d 68].)

It would seem that if a defendant who waives the assistance of counsel is competent to represent himself, he should do so, *by himself*; if he is not able to defend himself without the assistance of advisory counsel, then he is not competent to represent himself. This is not to say that we oppose the right of trial courts to appoint advisory counsel or stand-by counsel as part of their inherent power to control the proceedings. However, where a court does not exercise this right, a defendant who has competently elected to represent himself should not be heard to complain that he was denied the assistance of advisory or stand-by counsel.

III-V*

. . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 1422.

## DISPOSITION

The judgment is modified such that Garcia's sentence on count 2 is life with the possibility of parole plus 10 years for the personal use of a firearm. The judgment is affirmed in all other respects.

McDonald, J., concurred.

**HUFFMAN, Acting P. J.,** Concurring.—I concur completely in the result reached by the majority and I concur in the reasoning of the majority opinion, except for the discussion entitled *"The Court Did Not Err in Failing to Appoint 'Advisory Counsel' for Garcia."* As to that portion of the opinion I concur only in the result.

I am sympathetic with the concerns expressed by the majority regarding the circumstances in which advisory counsel can be or must be appointed for defendants who exercise their rights under *Faretta v. California* (1974) 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562] (*Faretta*). Undoubtedly there is a tension between the claimed right to self-representation and the claim of some entitlement to the assistance of counsel, albeit in an advisory role. I also agree with the majority that we should not extend the rule of *People v. Bigelow* (1984) 37 Cal.3d 731 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723] (*Bigelow*) to noncapital cases, absent specific direction form the Supreme Court.

I disagree with the majority's criticism of *Bigelow, supra,* 37 Cal.3d 731 in this case. First, Garcia never requested advisory counsel. Thus he presents an issue never addressed in *Bigelow*, namely whether a court has a sua sponte duty to appoint advisory counsel. *Bigelow* does not compel such result, nor has Garcia presented any credible authority for the creation of such duty. I agree completely with the majority's conclusion that such rule is neither required, nor well advised.

I would end the analysis of this issue by holding there is no sua sponte duty in a noncapital case, which requires a trial court to appoint advisory counsel. In my view that is the only issue presented here. Thus the majority's criticism of *Bigelow, supra,* 37 Cal.3d 731 is a wholly unwarranted sojourn into a difficult area of constitutional law. It is certainly a trip which I am unwilling to take.

Nor am I willing to address the question of whether it can ever be an abuse of discretion for a trial court to grant the right to self-representation

and deny a request for advisory counsel. First, as I have indicated, that issue is not before us. Second, I am not convinced that a trial court is required to allow self-representation under *Faretta, supra,* 422 U.S. 806, where a defendant wants advisory counsel. Thus, I can conceive of circumstances where it would be an abuse of discretion to deny a request for advisory counsel. Such is not, of course, the case before us. Accordingly I cannot join in this portion of the majority opinion and concur only in its result.

Appellant's petition for review by the Supreme Court was denied July 12, 2000.