[No. A132915. First Dist., Div. Four. Apr. 18, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMAAL REX HARRISON, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.A.2., 3., 7., 8.a., c. and d., B. through D.

[black redaction bars]

## COUNSEL

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Catherine A. Rivlin and Allan Yannow, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HUMES, J.**—A jury convicted defendant Jamaal Rex Harrison of sex offenses in connection with attacks on four women over a period of two years, and he was sentenced to 100 years to life in prison. On appeal, Harrison argues that his convictions must be reversed because the trial court declined to substitute his second appointed counsel, advised him improperly during the brief time when he was allowed to represent himself, failed to adequately continue the trial date, and prohibited him from questioning the victims about whether they had engaged in prostitution. He also argues that his defense counsel was ineffective and that the prosecutor engaged in misconduct. We reject each of these claims and affirm.

In the published portion of this opinion, we conclude that the trial court had no duty to inform Harrison of his option to request advisory counsel after it granted his request to represent himself.

### I.

#### FACTUAL AND PROCEDURAL BACKGROUND

A.   *Jane Doe No. 1*[1]

About 10:00 p.m. on April 4, 2006, 14-year-old Jane Doe No. 1 was waiting for a bus at 104th Avenue and International Boulevard in Oakland as

---

[1] The victims were identified at trial as Jane Does. (Pen. Code, § 293.5.) All statutory references are to the Penal Code unless otherwise indicated.

she was returning home from her boyfriend's house. Harrison attacked her by pulling her by her hair into his van and forcing her to copulate him orally as he drove away. He then drove to a secluded area and forced her to copulate him orally again, this time outside the vehicle. Harrison then raped Jane Doe No. 1, penetrating her about three times, and he tried to sodomize her. Harrison's DNA was found on a vaginal swab taken from the victim.

As a result of the attacks on Jane Doe No. 1, the jury convicted Harrison of one count of forcible rape (§ 261, subd. (a)(2)—count 1), two counts of forcible oral copulation (§ 288a, subd. (c)(2)—counts 2, 3), and one count of attempted forcible sodomy (§§ 286, subd. (c)(2), 664—count 4). As to each count, the jury also found true allegations under section 667.61 (commonly known as the one strike law) that Harrison kidnapped Jane Doe No. 1, which substantially increased her risk of harm (§ 667.61, subd. (d)(2)); kidnapped her in violation of various provisions of the Penal Code (§ 667.61, subd. (e)(1)); and committed sex offenses against multiple victims (§ 667.61, former subd. (e)(5), now subd. (e)(4)).

B. *Jane Doe No. 2*

Around 8:00 p.m. on November 1, 2006, 18-year-old Jane Doe No. 2 was walking on Foothill Boulevard in the eastern part of Oakland to visit a girlfriend, when Harrison attacked her from behind and dragged her into his van. He drove for 10 to 15 minutes, and then forced her to copulate him orally. He also digitally penetrated her, put his mouth on her chest, raped her twice, and hit her in the face and chest. Jane Doe No. 2 eventually was able to fight her way out of the vehicle. Employees of a nearby organic tea plant heard her screams and opened a garage door to let her in. Harrison's DNA was found on a vaginal swab taken from the victim.

The jury convicted Harrison of two counts of forcible rape (§ 261, subd. (a)(2)—counts 5, 6), one count of forcible oral copulation (§ 288a, subd. (c)(2)—count 7), and one count of sexual penetration (§ 289, subd. (a)(1)— count 8). As to each count, the jury also found true one strike allegations that Harrison kidnapped Jane Doe No. 2, which substantially increased her risk of harm (§ 667.61, subd. (d)(2)); kidnapped her in violation of various provisions of the Penal Code (§ 667.61, subd. (e)(1)); and committed sex offenses against multiple victims (§ 667.61, former subd. (e)(5)).

C. *Jane Doe No. 3*

In the early morning hours of September 29, 2007, 18-year-old Jane Doe No. 3 was near 12th and Market Streets in Oakland after attending a club where her cousin worked as a disc jockey. As she walked alone to her

brother's house, Harrison grabbed her and pushed her up the steps of a church and through a walkway. He then yanked her hair, forced her to copulate him orally three times, and raped her twice. Afterward, Harrison tied her up using her bra and shoelaces, and then he ran away. Harrison's DNA was found on a vaginal swab taken from the victim.

The jury convicted Harrison of three counts of forcible oral copulation (§ 288a, subd. (c)(2)—counts 9 through 11) and two counts of forcible rape (§ 261, subd. (a)(2)—counts 12, 13). As to each count, the jury also found true one strike allegations that Harrison kidnapped Jane Doe No. 3, which substantially increased her risk of harm (§ 667.61, subd. (d)(2)); kidnapped her in violation of various provisions of the Penal Code (§ 667.61, subd. (e)(1)); committed sex offenses against multiple victims (§ 667.61, former subd. (e)(5)); and tied or bound the victim in the commission of the crimes (§ 667.61, former subd. (e)(6), now subd. (e)(5)).

### D.  *Jane Doe No. 4*

In the early morning hours of April 6, 2008, 20-year-old Jane Doe No. 4 was near 14th Street and Broadway in Oakland after getting off a bus and walking alone toward her mother's house. Harrison forced her into his van and made her orally copulate him as he drove. He then parked his van in a dark, deserted area of San Pablo, where he digitally penetrated her, sodomized her, and forced her to copulate him orally two more times. He then drove away, and Jane Doe No. 4 called 911. Harrison's DNA was found on the victim's underwear and on a rectal swab taken from her.

The jury convicted Harrison of three counts of forcible oral copulation (§ 288a, subd. (c)(2)—counts 14, 15, 17) and one count of forcible sodomy (§ 286, subd. (c)(2)—count 16). As to each count, the jury also found true one strike allegations that Harrison kidnapped Jane Doe No. 4, which substantially increased her risk of harm (§ 667.61, subd. (d)(2)); kidnapped her in violation of various provisions of the Penal Code (§ 667.61, subd. (e)(1)); and committed sex offenses against multiple victims (§ 667.61, former subd. (e)(5)).

### E.  *Sentence*

The trial court sentenced Harrison to four consecutive terms of 25 years to life (one term for each victim), for a total indeterminate term of 100 years to life, with concurrent terms of 25 years to life on all remaining counts. This timely appeal followed.

## II.

### DISCUSSION

A. *Pretrial Representation*

1. *Appointment of trial counsel*

Harrison was represented at the preliminary hearing by an attorney who withdrew after the information was filed because Harrison could not afford to continue paying him. The trial court then appointed a new attorney for Harrison, but that attorney filed a motion to withdraw in less than two months, citing an irremediable breakdown in the relationship that made effective representation "impossible." The court granted the motion and, on the day before Thanksgiving 2010, selected a second court-appointed attorney, Deborah Levy, an experienced criminal defense lawyer, who represented Harrison through trial and sentencing.

2., 3.\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

4. *March 22, 2011* Faretta *hearing*

On March 21, the matter was continued to the following day, when Harrison filed a petition to represent himself under *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] (*Faretta*). At the March 22 hearing on the petition, the trial court told Harrison that his attorney was a skilled lawyer and that the court had concerns about Harrison representing himself in such a serious case. Harrison again complained that Levy had not visited him in jail to discuss strategy and had not given him information that he had requested.

The trial court noted that if Harrison continued to insist on his right to a speedy trial, the deadline to try him was April 1, 2011. When the court asked Harrison whether he would be ready in time, Harrison responded, "I'm more than most likely going to have [to] end up waiving time because I don't have all the information that I need and I been seeking to try to get, and then I'll take it from them [*sic*]. I already know I pretty much aren't [*sic*] going to be ready in a week."

The prosecutor objected to Harrison once again waiving his right to a speedy trial. At one point, the hearing judge called the judge who was then

---

\*See footnote, *ante*, page 647.

assigned to try the case to ask what might happen regarding the timing of the trial if Harrison waived his right to a speedy trial. The hearing judge then stated, "I think [the judge set to try the case] is going to make you go to trial within your 60 day period. So you are welcome to waive time and see how successful you are at that point. But you are not the only one involved in this trial, and that's sort of the bottom line. Because you've gone no time waiver, which is absolutely your right, you have forced the prosecutor to get ready. Now the prosecutor has got kind of a dog in this fight." The hearing judge also told Harrison: "I just asked [the judge assigned to try the case] about what her general policy is, and you'll be able to make whatever specific requests you have and whatever your reasons are, but I need you to understand really clearly at this point if I grant your motion to represent yourself it's with the understanding that you can go to trial within this 60 day period. Are you ready to do that?" Harrison confirmed that he was.

After advising Harrison at length about the pitfalls of self-representation and that he would be better off having Levy represent him, the trial court granted the *Faretta* motion. The court did not specifically address scheduling issues, but it is clear from the hearing transcript and the minute order that the parties were to return the following day for a disposition and setting hearing. Although Levy had been relieved as counsel, the court nonetheless ordered her to appear the next day, in the event that the trial judge wanted to "take up the issue of standby counsel." The court then explained to Harrison the role of standby counsel: "If you get into too much water where you are starting to drown, Ms. Levy would be prepared to step right back and she's already sort of tuned up on the case."

### 5. *March 23, 2011 hearing*

The following day, the trial judge stated that she was not sure whether Harrison intended to seek a continuance of the trial, but that it was her understanding that the case would go forward as previously scheduled. When Harrison protested that he needed more time to prepare, the court stated, "Well, you can go ahead and waive time. Perhaps that gives you an extra few days to look at things. I think there's case law indicating that there was—that it was improper for a Court to grant less than five days for a continuance when there's been a situation like that so you may get an extra week, but the trial is going forward." Harrison asked, "So if I go pro per, I can't get time to study my case?" The court responded, "You cannot choose to go pro per to delay a trial; that's improper."

Harrison thereafter waived his right to a speedy trial. The trial court then told him: "What I am considering doing is appointing Ms. Levy as standby counsel. What I don't want to happen is this [to] go to a trial department and

at the beginning, a third of the way or half the way and you decide that you can't represent yourself any longer, we talked about how serious this case is, and what you're facing in this case a bit, we touched on it a bit. I assume [the judge who handled the *Faretta* hearing] went through all of that with you yesterday. I see Ms. Levy is nodding her head in agreement, so I don't need to reiterate everything he said to you yesterday. But because of the nature of the charges here and the consequences of what you're facing, I am inclined to go ahead and appoint Ms. Levy as standby counsel. [¶] What that would mean is she's simply in the courtroom listening to the procedures, sir. She's not taking part in any way of doing anything up here like you'll be doing as an attorney for yourself. But she will be present in the courtroom observing everything so that, like I said, there wouldn't be any continuance granted during the trial, because you suddenly decide you can't represent yourself any longer. But you won't be consulting with her during trial. She won't be telling you what to do. You will solely be representing yourself as you wish to do." Levy accepted the appointment.

Harrison again asked if he could have additional time to "look over [his] stuff." The court responded, "I'm sure you were advised by [the judge hearing the *Faretta* motion] that you will be given the same time, the same rights as anyone else at Santa Rita [Jail] that's representing himself or herself. I am not going to give you any additional time . . . ." The trial court denied Harrison's request for a continuance, and the matter was set for a jury trial five days later, on March 28.

### 6. *March 28, 2011 request for counsel*

The matter was called on the trial calendar on March 28, and the prosecutor immediately raised scheduling issues, explaining that "two critical witnesses" who had been available when trial had been set for the previous week now had planned vacations. The prosecutor expressed concern that Harrison was entitled to "some kind of continuance in order for him to prepare if he's continuing pro per," but that a one-week continuance "would put me right in the middle of my witness scheduling problems." The following exchange then took place:

"THE COURT: Okay. Let me just ask you, Mr. Harrison, you still want to continue representing yourself in this matter?

"THE DEFENDANT: I didn't know it was going to be like this.

"THE COURT: I can't hear you.

"THE DEFENDANT: I said I didn't know it was going to be like this. I can't do this on my own.

"THE COURT: Yeah, as I'm sure you will remember, I expressed serious misgivings about you representing yourself in a matter of this nature where it's my understanding I believe there's DNA evidence and obviously you're facing a lot of time in custody. [¶] Is this a life?

"[The prosecutor]: Yes, many times over.

"THE COURT: Yeah, life in custody on this. Do you want me to go ahead and reappoint Ms. Levy as your counsel in this matter?

"THE DEFENDANT: I mean—

"THE COURT: Your *Marsden* motion was denied . . . as I understand it.

"THE DEFENDANT: Yeah—I mean, yeah.

"THE COURT: Do you want your attorney back in the case?

"THE DEFENDANT: Yeah, I can't do this on my own.

"THE COURT: Okay. I just want to make sure you're voluntarily now on your own, you're not being forced or coerced, but you voluntarily wish to have Ms. Levy represent you again?

"THE DEFENDANT: Yes."

The trial court then reappointed attorney Levy as defendant's counsel. Following a recess called so that the parties could discuss scheduling issues, both parties agreed to put the matter over until April 25 for trial.

7.   *April 25, 2011* Marsden *hearing**

. . . . . . . . . . . . . . . . . . . . . . . . .

8.   *No Pretrial Rulings Warrant Reversal*

Harrison contends that his convictions should be reversed because of alleged errors made during pretrial proceedings. We reject each of his arguments.

*See footnote, *ante*, page 647.

### a. *A Trial Continuance Was Not Improperly Denied*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### b. *Trial Court Had No Duty to Tell Harrison About Advisory Counsel Option*

■ Harrison also claims that his convictions should be reversed because the trial court, after granting his motion to represent himself, did not advise him that he had the right to ask for " 'advisory counsel' or request an attorney to act as both advisory and standby counsel." We conclude that the trial court had no duty to give such advice. When Harrison was allowed to represent himself, the trial court appointed Levy as standby counsel. As was explained to Harrison, under a standby counsel arrangement, "the attorney takes no active role in the defense, but attends the proceedings so as to be familiar with the case in the event that the defendant gives up or loses his or her right to self-representation . . . ." (*People v. Moore* (2011) 51 Cal.4th 1104, 1119, fn. 7 [127 Cal.Rptr.3d 2, 253 P.3d 1153].) By contrast, where "advisory counsel" is appointed, "the attorney actively assists the defendant in preparing the defense case by performing tasks and providing advice pursuant to the defendant's requests, but does not participate on behalf of the defense in court proceedings . . . ." (*Ibid.*) Our Supreme Court has made clear that "a defendant has *no right*, under either the federal or state Constitution, to [such forms of] 'hybrid representation.' Criminal defendants have the constitutional right to have an attorney represent them, and the right under the federal Constitution to represent themselves, *but these rights are mutually exclusive.*" (*Id.* at pp. 1119–1120, italics added, fn. omitted.) Although the trial court may "permit the sharing of responsibilities between a defendant and a defense attorney when the interests of justice support such an arrangement," it is within the court's discretion to do so. (*Id.* at p. 1120.)

Where a defendant in a noncapital case has not requested advisory counsel, the trial court is under no obligation to appoint one sua sponte. (*People v. Garcia* (2000) 78 Cal.App.4th 1422, 1429 [93 Cal.Rptr.2d 796]; see *People v. Hamilton* (1989) 48 Cal.3d 1142, 1164, fn. 14 [259 Cal.Rptr. 701, 774 P.2d 730] [court may appoint advisory counsel " '*if* and when the accused requests help' " (italics added)].) "[A] defendant who has competently elected to represent himself should not be heard to complain that he was denied the assistance of advisory . . . counsel." (*Garcia*, at p. 1431; see *Brookner v. Superior Court* (1998) 64 Cal.App.4th 1390, 1394 [76 Cal.Rptr.2d 68] ["It seems to us that a defendant either has an attorney or he is his own attorney—period."].) The rule that a defendant who exercises his right to

---

[*]See footnote, *ante,* page 647.

self-representation cannot later complain that the quality of his defense amounted to ineffective assistance of counsel "is entirely eviscerated when a defendant is allowed to challenge a verdict on the ground that he or she was not provided with advisory or stand-by counsel." (*Garcia*, at p. 1430.) Accordingly, we will not set aside the verdict in this case merely because the trial court declined to advise Harrison on its own initiative that he could ask for something to which he was not entitled.

■ The notion that a trial court has a duty to inform a defendant of the right to standby counsel has been rejected by the Ninth Circuit: "To require that a court conducting a *Faretta* colloquy inform a criminal defendant that he or she may or may not receive a standby counsel would do nothing to focus the inquiry for the defendant[']s knowing and intelligent decision [to represent himself or herself]. Because there is no right to have a standby counsel appointed during self-representation, it follows that there is no right to have the court advise about the possibilities of standby counsel during the *Faretta* colloquy." (*U.S. v. Mendez-Sanchez* (9th Cir. 2009) 563 F.3d 935, 947.) ■ We find this reasoning persuasive and equally applicable in the context of advisory counsel. (*People v. Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129] [although Cal. courts not bound by decisions of lower federal courts, "they are persuasive and entitled to great weight"].)

■ In this case, there is even less reason to conclude that the trial court needed to advise Harrison about advisory counsel because the court acted on its own to protect his interests by appointing standby counsel. (*People v. Moore, supra*, 51 Cal.4th at p. 1120.) Moreover, there is no reason to believe that appointing advisory counsel would have better protected Harrison given his disagreement with his counsel's strategy decisions. We reject this claim of error.

c., d.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B.–D.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[*]See footnote, *ante*, page 647.

## III.

### Disposition

The judgment is affirmed.

Ruvolo, P. J., and Reardon, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 17, 2013, S210822.