Filed 5/9/13  P. v. Estrada CA2/3
Opinion following rehearing

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for
publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication
or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| THE PEOPLE, | B235543 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA077406) |
| v. | |
| ELVIN ORLANDO ESTRADA, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Darrell S. Mavis, Judge.  Affirmed.

Richard C. Neuhoff, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

Elvin Orlando Estrada appeals from the judgment entered following his conviction by jury on count 1 – first degree murder (Pen. Code, § 187) with personal use of a dangerous or deadly weapon (Pen. Code, § 12022, subd. (b)(1)).  The court sentenced appellant to prison for 26 years to life.  We affirm the judgment.

## FACTUAL SUMMARY

The evidence established that about 5:00 p.m. on July 16, 2009, Isis Villalobos, Dagoberto Aguilar, and appellant were drinking in a parking lot near a Pasadena restaurant.  Villalobos testified as follows.  Villalobos had known appellant for a long time.  Less than an hour after the three were in the parking lot, they entered the restaurant.  Mario Sanchez (the decedent) joined them.

Appellant later gave Sanchez $20 to get beer, and Sanchez left.  When, after 30 minutes, Sanchez failed to return, appellant became angry and left to get beer.  Sanchez returned with beer, and appellant later returned with beer.  Appellant angrily asked Sanchez why it had taken Sanchez so long to return.  Sanchez, Villalobos, Aguilar, and appellant subsequently drank until nighttime.

Villalobos also testified as follows.  Villalobos, Aguilar, and appellant exited the restaurant around closing time.  The three went to a nearby parking lot and resumed drinking.  Sanchez joined them and the four continued drinking.  Sanchez offered methamphetamine to appellant and Aguilar.  Appellant assaulted Sanchez and Sanchez fell.  Appellant grabbed Sanchez by his hair and tried to stab him with a knife.  Appellant said he was angry because Sanchez had returned late with the beer.  Aguilar pushed appellant off Sanchez, Sanchez asked appellant not to hurt Sanchez because Sanchez had children, and Sanchez told appellant that "if it was [Sanchez's] time, it was his time but that he had children and that his cousin lived near the body shop."  Appellant calmed down.  Appellant asked Aguilar why he was defending Sanchez.

Appellant later said that they could not let Sanchez go because Sanchez might go to the police because appellant had tried to rob Sanchez.  Sanchez told appellant not to worry because Sanchez would not go to the police.  The group then resumed drinking.  About five minutes later, appellant pushed Sanchez, grabbed him by his hair, and

repeatedly stabbed him, mortally wounding him. Appellant left first, then Aguilar, then Villalobos. Villalobos testified appellant had the knife in his hand as he walked away.

Villalobos heard a helicopter, then saw appellant enter a house. Aguilar told appellant to exit the house and appellant complied. Appellant told Villalobos and Aguilar not to say anything to the police, and Aguilar told appellant not to worry and that Villalobos would not say anything. Appellant left in one direction and Aguilar and Villalobos left in another.

On July 21, 2009, Pasadena Police Officer Timothy Bundy interviewed Aguilar. Aguilar initially denied he had been present during the crime, but later provided information about what he had seen. Aguilar told Bundy that appellant had fled and was no longer in Pasadena. Bundy released Aguilar and no longer considered him a suspect.

On July 23, 2009, law enforcement personnel arrested appellant in New Jersey. On August 2, 2009, Pasadena Police Officer Javier Aguilar interviewed appellant. (We will refer to the officer as officer Aguilar to distinguish him from Dagoberto Aguilar, whom we simply refer to as Aguilar.) Officer Aguilar testified as follows. During the interview, appellant offered to show the officer the location of the knife appellant had used. Appellant led the officer to a dumpster behind a liquor store on Madre and Colorado. Appellant pointed towards the dumpster and, referring to the knife, said " 'That's where I dumped it.' " It was clear appellant was referring to the knife he had used to stab Sanchez.

The dumpster was empty so officer Aguilar entered the liquor store to ask when the dumpster had been emptied. Officer Aguilar later exited the store and a store employee, Dagoberto Medina, later exited. Medina immediately recognized appellant and asked appellant why he was in custody or if appellant was in trouble. Officer Aguilar testified appellant replied to Medina, " 'I killed someone.' " Medina shook his head and walked away.

Bundy also testified as follows. On August 2, 2009, appellant, in jail, had a telephone conversation with someone. Bundy listened to a recording of that conversation. During the conversation, appellant said "people had already laid him out

3

and he didn't have a choice but to tell the truth, . . ." Appellant expressed displeasure at Villalobos and Aguilar for "throwing dirt" on appellant.

A transcript of the above telephone conversation reflects that at one point appellant said ". . . I had to tell the truth. Well, you know what, no shit, I ripped the dude. It was me, I said." The transcript also reflects appellant suggested Aguilar "ratted [appellant] out." An autopsy revealed Sanchez died from seven stab wounds in his neck, three of which were fatal, and he had no defensive wounds on his hands.

Aguilar's preliminary hearing testimony was admitted into evidence at trial. His preliminary hearing testimony as to the events up to and including the stabbing of Sanchez was similar to Villalobos's testimony and, at the preliminary hearing, Aguilar identified appellant as the person who stabbed Sanchez.[1] Appellant presented no defense evidence.

## ISSUES

Appellant claims (1) the admission into evidence of Aguilar's preliminary hearing testimony violated appellant's constitutional right to confrontation because Aguilar was not constitutionally unavailable, (2) the trial court erroneously failed to instruct that the jury must view with caution an accomplice's testimony, (3) the trial court erroneously failed to instruct that accomplice testimony must be corroborated, (4) appellant was denied effective assistance of counsel at trial, and (5) cumulative prejudicial error occurred.

---

[1] At the preliminary hearing, Aguilar also testified that he got blood on his clothing after this incident, and it seemed he threw away that clothing. He believed someone took his shirt from the parking lot. He gave conflicting testimony as to whether he left the shirt in the parking lot, and said he did not know what happened to it.

## *DISCUSSION*

1. *Aguilar's Preliminary Hearing Testimony Was Properly Admitted Into Evidence.*

      a. *Pertinent Facts.*

            (1) *Relevant Prior Proceedings.*

On February 11, 2010, appellant's preliminary hearing occurred, and Aguilar testified at that proceeding. Later in February 2010, the trial court filed the information in this case. The trial court continued the case multiple times for trial or trial setting, including to March 28, 2011, for trial. The court later continued the case multiple times for trial, including to the May 4, 2011 trial date. On May 6, 2011, the jury was sworn.

            (2) *The May 6, 2011 Admissibility Hearing.*

               (a) *Court Exhibits.*

On May 6, 2011, before the jury was sworn, the prosecutor proffered Aguilar's preliminary hearing testimony as evidence at trial. On that day, the court conducted an Evidence Code section 402 due diligence hearing and received court exhibit Nos. 1 and 2 into evidence.

Court exhibit No. 2, fairly read, reflects as follows. In April 2006, Aguilar violated federal law by illegally reentering the United States following his conviction for an aggravated felony (8 U.S.C. § 1326(a)). In that matter, a federal court in Florida committed him to federal prison on November 9, 2009, and his scheduled prison release date was September 1, 2010.

The exhibit also reflects that on January 5, 2010, the United States Immigration and Naturalization Service (INS) lodged a detainer for Aguilar with the Federal Bureau of Prisons (Bureau). The charge was "deportation." (Capitalization omitted.) A "prior notifies" (capitalization omitted) section of the exhibit suggests that, on January 5, 2010, the Bureau received notice from the Pasadena Police Department (Pasadena) that Pasadena wanted the Bureau to notify Pasadena concerning Aguilar. The exhibit does not reflect the content of the notification that Pasadena wanted. The exhibit also suggests that on July 29, 2010, the Bureau issued the above notification to Pasadena. The exhibit

5

indicates that on September 1, 2010, the Bureau released Aguilar to United States Immigrations and Customs Enforcement (ICE).

Court exhibit No. 1, fairly read, reflects as follows. Omar Charris, an ICE agent, sent to Pasadena Police Officer Jason Van Hecke a document reflecting, inter alia, Aguilar had been in ICE custody from September 1, 2010, to October 13, 2010. On October 13, 2010, Aguilar was released, and the exhibit reflects the "release type" (capitalization omitted) as "DEP." We will present additional facts below concerning court exhibit No. 1.

(b) *Van Hecke's Testimony.*

Van Hecke testified at the admissibility hearing as follows. At some point prior to the hearing, Pasadena Police Detective Curry, the investigating officer in this case, was injured on duty. Prior to May 2, 2011, Van Hecke had not been involved with the present case. On May 2, 2011, Curry's partner, Pasadena Police Detective Gomez, asked Van Hecke to follow up on the whereabouts of Aguilar. The only task assigned to Van Hecke was for him to locate INS documents, and he was unaware of any other efforts to secure Aguilar's attendance at trial.

Aguilar was present at the February 11, 2010, preliminary hearing, but was also in the custody of federal prison authorities in Colorado. Gomez told Van Hecke that Aguilar had been deported in 2010, but Gomez did not tell Van Hecke when Gomez found out Aguilar had been deported.

On May 2, 2011, Van Hecke contacted Kimberly Worsham, a clerk in the federal prison in Colorado. Worsham's database reflected Aguilar had been in custody in Colorado until September 2010, when he was released to immigration authorities. Worsham told Van Hecke that the reference in court's exhibit No. 2 to "deportation" (with a release date of September 1, 2010) indicated federal prison authorities released Aguilar to the custody of immigration authorities for purposes of deportation.

On May 5, 2011, Charris told Van Hecke the following. Court's exhibit No. 1 reflected information from Charris's computer. The reference to "DEP" in the exhibit meant Aguilar was deported on that date (i.e., October 13, 2010). The exhibit reflected

6

Aguilar was born in, and deported to, El Salvador. Aguilar "currently was deported" at the time Van Hecke spoke with Charris.

(c) *Argument at the Admissibility Hearing.*

During argument, the People asked the court to find that Aguilar was unavailable as a witness for purposes of Evidence Code section 240, subdivision (a)(4) because he had been deported to El Salvador. Although appellant did not expressly refer to the federal Constitution, he argued the People had not demonstrated due diligence to secure Aguilar's attendance at trial. In particular, appellant argued the People failed to exercise due diligence to prevent Aguilar from being deported and failed to exercise due diligence in that the People failed to consult databases to determine if Aguilar had illegally reentered the United States after he was deported.

The court found under Evidence Code section 240, subdivision (a)(4) that the court could not compel Aguilar's attendance at trial and he was unavailable. The court stated it had no evidence, and the court could not assume, Aguilar had illegally reentered the United States, and the court indicated it had evidence Aguilar had not reentered.

(d) *Evidence Presented at Trial.*

Bundy testified at trial as follows. On July 21, 2009, Bundy interviewed Aguilar. Bundy told Aguilar that Bundy was not concerned with whether Aguilar was in the United States illegally and that Bundy just wanted to talk. Aguilar knew he would be in ICE custody in federal prison, and Aguilar "was confident he was going to be turned over to immigration." Bundy released Aguilar shortly after the interview. However, Aguilar still had an immigration hold on him, so he was transferred from Pasadena custody to ICE custody.

As mentioned, Aguilar's preliminary hearing testimony was admitted into evidence at trial. Aguilar testified at the February 11, 2010 preliminary hearing that he was afraid he would be deported based on the Sanchez murder. We will present additional facts where pertinent below.

7

b. *Analysis.*

Appellant claims the admission into evidence of Aguilar's preliminary hearing testimony violated appellant's constitutional right to confrontation because Aguilar was not constitutionally unavailable. Appellant argues the People (1) failed to exercise due diligence to prevent Aguilar from becoming absent as a consequence of deportation, (2) failed to exercise due diligence in that the People failed to consult databases to determine if Aguilar had illegally reentered the United States after he was deported, and (3) failed to do anything to locate Aguilar until two days before trial. We reject appellant's claim.[2]

(1) *No Confrontation Error Occurred.*

In *People v. Herrera* (2010) 49 Cal.4th 613 (*Herrera*), our Supreme Court stated, "A witness who is absent from a trial is not 'unavailable' in the constitutional sense unless the prosecution has made a 'good faith effort' to obtain the witness's presence at the trial. [Citation.]" (*Id.* at p. 622.) The prosecution must exercise due diligence. (*Ibid.*) Considerations relevant to the due diligence inquiry include the importance of the proffered testimony. (*Ibid.*)

The proponent of the evidence has the burden of showing that the witness is unavailable. (*People v. Smith* (2003) 30 Cal.4th 581, 609.) "We review the trial court's resolution of disputed factual issues under the deferential substantial evidence standard [citation], and independently review whether the facts demonstrate prosecutorial good faith and due diligence [citation]." (*Herrera*, *supra,* 49 Cal.4th at p. 623.)

As to the People's alleged failure to exercise due diligence to prevent Aguilar from becoming absent as a consequence of deportation, the pertinent facts reveal the following. On July 21, 2009, Bundy interviewed Aguilar concerning the present case

---

[2]    There is no dispute that as a matter of state law Aguilar was " 'unavailable as a witness' " within the meaning of Evidence Code section 240, subdivision (a)(4) and Aguilar's preliminary hearing testimony was therefore admissible as against a state law hearsay objection because the former testimony hearsay exception (Evid. Code, § 1291, subd. (a)(2)) applied.

while he was in the custody of Pasadena but, a few days later, Pasadena released him to INS custody. He was in federal prison in Colorado on an immigration offense from November 9, 2009 to September 1, 2010, inclusive. As of February 11, 2010, when Aguilar testified at appellant's preliminary hearing, Aguilar was in custody of federal prison authorities and subject to an INS detainer.

On September 1, 2010, federal prison authorities released Aguilar to INS custody. INS commenced deportation proceedings. On October 13, 2010, INS deported Aguilar. We assume without deciding that the People knew at least as early as February 11, 2010, that there was a substantial risk INS would deport Aguilar, and that this triggered a prosecutorial duty to use reasonable means to prevent his absence. (See *People v. Wilson* (2005) 36 Cal.4th 309, 342.)

In *People v. Roldan* (2012) 205 Cal.App.4th 969, cited by appellant, a witness in the custody of federal immigration authorities testified at the defendant's preliminary hearing and, shortly thereafter, was deported. (*Id.* at pp. 973, 976-977.) The defendant claimed the admission into evidence of the witness's preliminary hearing testimony at the defendant's trial violated his right to confrontation because the witness was not constitutionally unavailable at the time of trial. (*Id.* at p. 975.)

*Roldan* concluded the People had failed to exercise due diligence in attempting to secure the witness's attendance at trial. (*Roldan, supra*, 205 Cal.App.4th at p. 978.) *Roldan* observed the People had a duty to use reasonable means to prevent a present witness from becoming absent (*id.* at p. 980) and *Roldan* identified several legal remedies the People might have attempted to employ.[3] *Roldan* concluded based on its facts that the People, having failed to attempt to use any of those means, had not exercised due diligence. (*Id.* at p. 985.)

---

**3**      The procedures included the videotaping of a witness's testimony, judicial detention of a material witness, reliance on federal regulations pertaining to alien material witnesses, and federal writs of habeas ad testificandum. (*Roldan*, *supra,* 205 Cal.App.4th at pp. 980-984.)

9

However, not every failure by the People to secure the attendance of a witness at trial constitutes a failure to exercise the requisite due diligence, and *Roldan* is distinguishable from the present case. *Roldan* acknowledged that one of the considerations relevant to the due diligence inquiry was the importance of the proffered testimony. (*Roldan*, *supra,* 205 Cal.App.4th at p. 979.) In *Roldan*, the witness, Barrera, was a key witness for the People and, absent Barrera's preliminary hearing testimony, there was no direct evidence presented at trial that the defendant committed the shooting at issue in that case. *Roldan* characterized the remaining evidence presented at trial and implicating the defendant as "circumstantial and minimal." (*Id.* at p. 980, fn. 3.)

We have recited in our Factual Summary the pertinent facts concerning appellant's offense. It is not true that, absent Aguilar's preliminary hearing testimony, there was no direct evidence appellant fatally stabbed Sanchez. Aguilar's preliminary hearing testimony was cumulative on that issue. Villalobos identified appellant as the person who stabbed Sanchez. Moreover, as discussed *post*, there was overwhelming evidence of appellant's guilt. Accordingly, Aguilar's testimony was not vital or critical to the prosecution's case. (Cf. *People v. Hovey* (1988) 44 Cal.3d 543, 564 (*Hovey*).)[4] We conclude the People did not, prior to the deportation of Aguilar, fail to use reasonable diligence to secure his attendance at trial.

As to the People's alleged failure to exercise due diligence in that the People failed to consult databases to determine if Aguilar had illegally reentered the United States after he was deported, the pertinent facts reveal INS deported Aguilar on October 13, 2010,

_____

[4]    In *Hovey*, the court stated, inter alia, "In *Louis, supra*, we held that if a particular witness's testimony is deemed *'critical' or 'vital'* to the prosecution's case, the People must take reasonable precautions to prevent the witness from disappearing. [Citation.]" (*Hovey, supra*, 44 Cal.3d at p. 564, italic added.) However, *Hovey*, discussing a witness Lee whose preliminary hearing testimony was admitted into evidence at the trial at issue in *Hovey* (*id*. at p. 554) stated, inter alia, "In the present case, unlike *Louis*, witness Lee's probable trial testimony would not have been so 'vital' to the prosecution's case, because it was largely cumulative of [a cellmate's] testimony." (*Id.* at p. 564.) *Hovey* rejected the defendant's claim the prosecution had failed to demonstrate due diligence in procuring Lee's attendance at trial. (*Id*. at pp. 562-564.)

and he remained deported as of May 5, 2011. The due diligence admissibility hearing in this case occurred the next day.

Like the present case, *Herrera* involved the deportation of an El Salvadoran witness. (*Herrera, supra,* 49 Cal.4th at pp. 617, 619.) *Herrera* observed the El Salvadoran witness in its case had been deported after the preliminary hearing; the witness was in El Salvador at the time of trial and therefore beyond the court's own process; attempts to locate the witness in El Salvador proved unsuccessful; and even if the witness could have been found there, the United States and El Salvador had no treaty or agreement providing for an alternative means to compel or facilitate his attendance at trial. (*Id.* at p. 629.)

*Herrera* held that, under the circumstances, the People fulfilled their obligation of good faith and due diligence, the witness was unavailable, and the admission of his preliminary hearing testimony at trial was proper. (*Herrera, supra,* 49 Cal.4th at p. 629.) Significantly, *Herrera* rejected as pure conjecture the suggestion the witness might have returned to California. (*Id*. at p. 631.)

We similarly conclude the People did not fail to exercise due diligence by not consulting databases to determine if Aguilar had illegally reentered the United States after he was deported. Our conclusion *post* that there was overwhelming evidence of appellant's guilt informs our present due diligence analysis as well. Moreover, the fact Van Hecke began his efforts to locate Aguilar on May 2, 2011, does not affect the analysis. And *Herrera* refrained from deciding what, if any, prosecutorial efforts might be constitutionally required when, after a witness has been deported, there is no contact between the People and the witness. (Cf. *Herrera, supra*, 49 Cal.4th at p. 627, fn. 8.)

Aguilar was constitutionally unavailable and the trial court properly admitted into evidence his preliminary hearing testimony. (*Herrera, supra,* 49 Cal.4th 613, 624-625, 627-628, fn. 9.)

(2) *Any Confrontation Error Was Not Prejudicial.*

Finally, even if the admission into evidence of Aguilar's preliminary hearing testimony was error, reversal is not required. Appellant argues Aguilar's preliminary hearing testimony was prejudicial for four reasons discussed *post.*

(a) *The Alleged Error Was Not Prejudicial on the Issues of Premeditation and Deliberation.*

First, appellant argues Aguilar's preliminary hearing testimony was prejudicial on the issue of whether appellant committed first degree deliberate and premeditated murder as opposed to second degree murder. We disagree.

Appellant does not expressly dispute someone murdered Sanchez by stabbing him. There was substantial evidence from Villalobos's testimony as follows. Appellant gave Sanchez money to get beer, Sanchez did not return within 30 minutes, and appellant became angry. Appellant later angrily asked Sanchez why it took so long for Sanchez to return. Appellant later assaulted Sanchez and Sanchez fell. Appellant grabbed Sanchez by his hair and tried to stab him with a knife. Appellant said he was angry because Sanchez had returned late with the beer. Aguilar intervened, Sanchez asked appellant not to hurt Sanchez, and Sanchez told appellant "if it was [Sanchez's] time, it was his time." Appellant calmed down, and appellant asked Aguilar why he was defending Sanchez.

Appellant later said he could not let Sanchez go because Sanchez might go to the police because appellant had tried to rob Sanchez. Sanchez told appellant not to worry because Sanchez would not go to the police. Nonetheless, about five minutes later, and without provocation or threats from Sanchez, appellant pushed Sanchez, grabbed him by his hair, and, while Sanchez was thus in a vulnerable position, repeatedly stabbed him in the neck, killing him. The jury reasonably could have concluded appellant's first attack was evidence the second and fatal attack was not unconsidered or rash, both attacks were motivated, at a minimum, by appellant's anger towards Sanchez for failing to return timely with beer, and appellant deliberately attacked Sanchez the second time without warning to avoid intervention from Aguilar.

12

Appellant stabbed Sanchez seven times in the neck, a particular and exacting killing, and three of the neck wounds were fatal. The wounds were not the result of aimless swinging but were centered on the neck, where knife wounds would be lethal. The unresisting Sanchez had no defensive wounds, and there was no evidence he was armed or had a prior history of threatening or committing violence against appellant. Appellant left the scene with the knife in his hand and did not call for medical assistance for Sanchez.

Appellant told Villalobos and Aguilar not to say anything, attempted to conceal the murder weapon by throwing it into a dumpster, and fled, ultimately to New Jersey. These actions evidenced consciousness of guilt. Appellant made incriminating statements in jail. Appellant also told Medina, " 'I killed someone,' "[5] and Officer Aguilar did not testify appellant suggested to Medina that the killing was an unconsidered or rash action.

We conclude that, even if the admission into evidence of Aguilar's preliminary hearing testimony was error, there was overwhelming evidence that appellant committed first degree deliberate and premeditated murder (cf. *People v. Cook* (2006) 39 Cal.4th 566, 603; *People v. Perez* (1992) 2 Cal.4th 1117, 1128; *People v. Raley* (1992) 2 Cal.4th 870, 887-888; *People v. Garcia* (2000) 78 Cal.App.4th 1422, 1427-1428; *People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102; *People v. Clark* (1967) 252 Cal.App.2d 524, 528-530); therefore, the alleged error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705] (*Chapman*).)

Appellant argues a contrary conclusion is compelled for several reasons. First, he argues that the prosecutor, during jury argument, commented Villalobos and Aguilar agreed on core issues that appellant unsuccessfully assaulted Sanchez and, minutes later and after things had calmed, successfully assaulted Sanchez again. However, even

---

[5]    Appellant asserts "the jury *could* well have concluded that appellant actually *meant* to say that '*they claim* I killed someone' and that the officer misunderstood the remark or was predisposed to hear a law-enforcement favorable remark." (First and second italics added.) There is no support in the record for appellant's assertion.

assuming the trial court erroneously admitted Aguilar's preliminary hearing testimony into evidence, appellant cites no authority for the proposition the erroneous admission of merely cumulative evidence precludes a conclusion the error is harmless beyond a reasonable doubt. Moreover, we previously discussed that there was overwhelming evidence of premeditation and deliberation. That discussion reveals there was more evidence (from Villalobos's testimony and other evidence) of premeditation and deliberation than appellant's above argument acknowledges.

Second, appellant argues (1) Villalobos had a "motive to point the finger away from her 'best friend' Aguilar and herself," (2) she gave dubious claims, contradicted by her own relatives, about her relationship with Aguilar, and (3) she gave inconsistent accounts of how long she had known Aguilar. However, appellant's showing on this issue does not demonstrate the alleged error in admitting into evidence Aguilar's preliminary hearing testimony was not harmless beyond a reasonable doubt.[6] Moreover, the argument that Villalobos had a motive to point the finger away from Aguilar and herself goes more to the issue of identity than to the issues of premeditation and deliberation.

Third, appellant argues that "[Villalobos's] versions of the events on the fateful night had inconsistencies and improbabilities. For example, she claimed that she had never previously been drunk, or even tipsy, yet she admitted downing three

---

[6] Appellant's citations to the record reveal the following facts. Villalobos denied at trial that she had a romantic relationship with Aguilar. Bundy testified Villalobos and Aguilar denied to Bundy that Villalobos and Aguilar had a romantic relationship. When appellant asked Bundy during cross-examination whether Villalobos referred to Aguilar as someone she had known for about a month prior to the date of the incident, Bundy replied, "The times that she gave varied throughout. I don't recall exactly at which point she said one month as opposed to other ones." Bundy believed Villalobos told Bundy that she had known Aguilar for a month. Bundy testified a cousin of Villalobos identified Aguilar as Villalobos's boyfriend. Appellant does not indicate if Bundy testified whether this single unidentified cousin indicated for how long Aguilar allegedly had been Villalobos's boyfriend. Finally, Aguilar, during his preliminary hearing testimony, testified that he and Villalobos were friends.

14

or four beers that night. . . .  And though she was a supposed novice at alcohol consumption, she improbably claimed that the multiple beers she imbibed did not make her intoxicated — a claim that Aguilar contradicted."  However, appellant's general showing pertaining to Villalobos's credibility does not demonstrate any error in admitting Aguilar's preliminary hearing testimony was not harmless beyond a reasonable doubt.[7]  Moreover, again, there was more evidence of premeditation and deliberation than appellant's above argument acknowledges.

Fourth, appellant argues, "Most significant, though, is that [Villalobos] told very different versions of how the murder took place.  Initially, it was part of a drug robbery by appellant, and then it was rage over a delayed beer delivery, and then it was robbery again. . . .  Initially, appellant gave Sanchez's drugs to Aguilar, then he didn't, he scattered them on the ground."  Again, appellant's showing does not demonstrate Aguilar's preliminary hearing testimony was not harmless beyond a reasonable doubt.[8]

Appellant's citation to *People v. Sandoval* (2001) 87 Cal.App.4th 1425 (*Sandoval*) is inapposite.  That case concluded the erroneous admission into evidence at trial of the preliminary hearing testimony of one of two People's eyewitnesses was prejudicial to the

_____

[7]     Villalobos testified, "I *just* had three beers there.  Three or four."  (Italics added.) She had not been "exactly drunk" before and had not been tipsy.  She denied "*feeling* that [she was] drunk on the night that this happened," adding "[h]ad I been like that, I wouldn't have remembered anything."  The pages cited by appellant do not demonstrate Villalobos was a "novice at alcohol consumption" and Villalobos never used the term "intoxicated" in her testimony reflected in the pages cited by appellant.

[8]     Appellant's citations to the record reveal that Villalobos testified during direct examination by the People *both* that (1) appellant's first and second attacks upon Sanchez were motivated by appellant's anger resulting from Sanchez's late return with beer *and* (2) appellant told Aguilar " 'we can't let [Sanchez] go because he might go to the police because I tried to rob him.' "  Moreover, although Bundy testified that when he interviewed Villalobos, she went into *great detail* about a different motive for the crime (i.e., the motive that appellant was robbing Sanchez of drugs), Bundy also testified he did not believe Villalobos was saying that that was the *sole* motive for the killing.  Moreover, the record cited by appellant simply indicates Villalobos told Bundy that appellant knocked from Sanchez's hand a dollar bill containing methamphetamine, it scattered, and after appellant obtained the drugs he gave them to Aguilar.

15

defendant's conviction for murder, in part because the remaining witness testified at trial under a grant of immunity. (*Id.* at pp. 1428, 1430.) Villalobos did not testify under a grant of immunity, and the issue at hand is whether the admission of Aguilar's preliminary hearing testimony was prejudicial to the issue of premeditation and deliberation, not to the issue of whether appellant committed murder.

(b) *The Alleged Error Was Not Prejudicial on the Issue of Manslaughter.*

Second, appellant argues Aguilar's preliminary hearing testimony was prejudicial on the issue of whether appellant committed murder as opposed to "manslaughter based on sudden quarrel." We disagree. Appellant was charged with first degree murder and Aguilar's preliminary hearing testimony presented as part of the People's case-in-chief was admissible on the issue of whether appellant committed that crime but not on the issue of whether he committed a crime(s) not charged, i.e., "manslaughter based on sudden quarrel." Aguilar's preliminary hearing testimony did not provide substantial evidence appellant was guilty, if at all, of "manslaughter based on sudden quarrel," and appellant does not expressly argue otherwise here except perfunctorily. Appellant presented no defense evidence. In sum, no substantial evidence that appellant committed only "manslaughter based on sudden quarrel" was presented to the jury in this case.

Moreover, appellant asked the trial court to instruct on voluntary manslaughter based on sudden quarrel using CALCRIM No. 570. The trial court refused to do so, concluding there was no substantial evidence to support such an instruction. Appellant never asked the court to give, and the court did not give, an instruction on involuntary manslaughter. Thus, the issue of whether appellant committed "manslaughter based on sudden quarrel" was never submitted to the jury by evidence or instructions.

If there had been substantial evidence that appellant was guilty, if at all, of "manslaughter based on sudden quarrel," the trial court's failure to instruct on that issue would have been error. (Cf. *People v. Breverman* (1998) 19 Cal.4th 142, 162.) Appellant does not claim the trial court erred by failing to instruct on "manslaughter based on sudden quarrel." The judgment of the trial court is presumed on appeal to be

16

correct and all intendments and presumptions are indulged in favor of the judgment. (*People v. Seneca Ins. Co.* (2004) 116 Cal.App.4th 75, 80.) We therefore presume the trial court properly failed to instruct on "manslaughter based on sudden quarrel," and that "manslaughter based on sudden quarrel" properly was not an issue at trial. It follows the admission into evidence of Aguilar's preliminary hearing testimony could not have been prejudicial on the issue of whether appellant committed "manslaughter based on sudden quarrel."[9]

(c) *The Alleged Error Was Not Prejudicial on the Issue of Identity.*

Third, appellant argues the admission into evidence of Aguilar's preliminary hearing testimony was prejudicial on the identity issue. We disagree. Villalobos testified to the effect that shortly before the stabbing, appellant tried to stab Sanchez with a knife but Aguilar intervened. Villalobos testified to the events leading to the later stabbing of Sanchez and testified appellant was the person who, using a knife, repeatedly stabbed Sanchez.

Villalobos testified that, after the stabbing, appellant told Villalobos and Aguilar not to say anything to police. Bundy testified Aguilar told Bundy that appellant had fled. These actions of appellant provided evidence of appellant's consciousness of guilt.

Appellant himself led police to the dumpster and told police he had dumped the knife there. Officer Aguilar testified without objection that it was clear appellant was referring to the knife appellant had used to stab Sanchez. Appellant himself told Medina, " 'I killed someone.' " In jail, appellant told someone that appellant " 'ripped the dude.' " There was overwhelming evidence appellant was the person who stabbed

---

[9] In his petition for rehearing, appellant argues Aguilar's preliminary hearing testimony was prejudicial on the issue of whether appellant committed murder as opposed to "manslaughter based upon *intoxication* or upon sudden quarrel." (Italics added.) We reject appellant's "manslaughter based upon intoxication" argument based on reasoning similar to our rejection of his "manslaughter based on sudden quarrel" argument. We also reject appellant's "manslaughter based upon intoxication" argument for the additional reason he raised it for the first time in his petition. (*People v. Mullens* (2004) 119 Cal.App.4th 648, 669, fn. 9.)

17

Sanchez; therefore, any erroneous admission into evidence of Aguilar's preliminary hearing testimony was harmless beyond a reasonable doubt on the identity issue. (Cf. *People v. Louis* (1986) 42 Cal.3d 969, 993; *Chapman, supra,* 386 U.S. at p. 24.)

### (d) *The Alleged Error Was Harmless Under Chapman.*

Finally, *Chapman* stated, "error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot . . . be conceived of as harmless." (*Chapman, supra*, 386 U.S. at pp. 23-24.) Appellant, quoting this statement from *Chapman*, argues Aguilar's preliminary hearing testimony was "plainly relevant evidence."

However, the quote from *Chapman* refers to plainly relevant evidence "which possibly influenced the jury." (*Chapman, supra*, 386 U.S. at p. 23.) And *Chapman* observed that "[t]here is little, if any, difference between . . . 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Id*. at p. 24) *Chapman* therefore "[held] . . . that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Ibid*.) Based on the whole record, and notwithstanding any arguments of appellant, considered alone or in combination, we declare that belief here.

### 2. *No Instructional Error Occurred Regarding the Issue of Accomplices.*

Appellant presents related claims the trial court erred by failing to instruct the jury that the jury must view with caution an accomplice's testimony and by failing to instruct that accomplice testimony must be corroborated. Appellant argues the trial court erred by failing to give these instructions as to the testimony of Villalobos and the preliminary hearing testimony of Aguilar. We reject appellant's claims.

18

We have recited the pertinent facts in our Factual Summary. Simply put, there was no substantial evidence that either Villalobos or Aguilar was an accomplice. The trial court was not required to give the instructions.[10] (Cf. *People v. Lewis* (2001) 26 Cal.4th 334, 369-370 (*Lewis*).) None of appellant's arguments or alleged facts compel a contrary conclusion.

Moreover, our previous analysis that there was overwhelming evidence of appellant's guilt compels the conclusion there was sufficient corroborating evidence. Appellant concedes the jury legitimately could have concluded appellant's statements corroborated the testimony of Villalobos and Aguilar. Any erroneous failure to instruct on the accomplice corroboration requirement was not prejudicial (cf. *Lewis, supra,* 26 Cal.4th at pp. 370-371) and did not violate appellant's constitutional right to due process, right to a fair trial, or right to present a defense. (*Id.* at p. 371.)

Further, because there was overwhelming evidence of guilt and the trial court gave CALCRIM No. 226 concerning a willfully false witness, and concerning witness credibility, any erroneous failure to instruct that accomplice testimony must be viewed with caution was not prejudicial. (*Lewis*, *supra*, 26 Cal.4th at p. 371.)

---

[10]     *People v. Hernandez* (2003) 30 Cal.4th 835, cited by appellant, does not compel a contrary conclusion as to the omission of the cautionary instruction in this case. In that case, the person, Rodrigues, whom *Hernandez* concluded was an accomplice to a killing *told* people that the defendant and Rodrigues were going to commit the killing. (*Id.* at p. 874.) In light of our analysis in this opinion, we reject appellant's claims that he was denied effective assistance of counsel (see *People v. Ledesma* (2006) 39 Cal.4th 641, 746) and cumulative prejudicial error occurred.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KITCHING, J.

We concur:


KLEIN, P. J.


ALDRICH, J.