Filed 3/16/22  P. v. Payne CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>KEVIN ANTHONY PAYNE, JR.,<br><br>      Defendant and Appellant. | B296845<br><br>(Los Angeles County<br>Super. Ct. No. BA469704) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Katherine Mader, Judge.  Convictions affirmed.  The sentence is vacated and cause remanded with directions.

Alan Tavelman, Michele H. Kendall; William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan

Sullivan Pithey, Senior Assistant Attorney General, Roberta L. Davis, Idan Ivri, William H. Shin and David Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury found Kevin Anthony Payne, Jr., guilty on four counts of attempted murder, two counts of shooting at an occupied vehicle and several related weapons offenses based primarily on surveillance videos showing him firing multiple shots at two individuals standing near a liquor store and into a bystander's SUV. On appeal he contends the trial court erred by permitting the investigating officer to identify him as the shooter as the surveillance videos were shown to the jury. He also argues the court committed other evidentiary error, the prosecutor engaged in prejudicial misconduct during closing argument, defense counsel provided constitutionally ineffective assistance and he was improperly deprived of the advice of standby counsel while representing himself at his preliminary hearing. Finally, he contends he was wrongly convicted on two counts of shooting at an occupied vehicle based on a single shot.

As for sentencing, Payne contends the trial court erred when imposing sentencing enhancements as part of his aggregate indeterminate state prison term of 144 years to life. In addition, in supplemental briefing Payne argues, because the court imposed the upper term of nine years for attempted murder as the principal term of his sentence (doubled under the three strikes law), he is entitled to resentencing pursuant to Senate Bill No. 567 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 731, § 1.3) (Senate Bill 567), enacted while Payne's appeal was pending, which amended the provisions of section 1170

2

concerning imposition of the upper, middle and lower terms of a determinate sentencing triad.

We agree only with Payne's sentencing arguments. We affirm his convictions, vacate the sentence and remand the cause with directions to the trial court to correct its previous errors and to resentence Payne in accordance with the terms of all applicable ameliorative legislation.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Shooting Near Holiday Liquor*

As shown on surveillance videos recovered from Holiday Liquor (located on the south side of West Adams Boulevard near South Longwood Avenue) and from a nearby church (located on the southeast corner of West Adams and South Longwood), at approximately 1:30 a.m. on May 13, 2018, as Henry Hall and Leamon Perkins left the liquor store, a Chrysler Pacifica drove up and parked along the south curb of West Adams. Three Black males, including the driver, got out of the vehicle. Los Angeles Police Detective Patrick Lane subsequently identified Payne as the driver.

The Chrysler Pacifica's two passengers passed Hall as they went into the liquor store, and the men looked at each other several times. Hall then walked past Payne, who had remained outside. The two men exchanged glances before Payne entered the store. After purchasing some items, Payne was standing in the doorway when Hall and Perkins returned to the store. Following an interchange between Hall and Payne, Payne and his two companions walked back to their vehicle. Hall and Perkins followed them. The minivan then drove away, and Hall and Perkins returned to the liquor store.

3

Approximately eight minutes later the Chrysler Pacifica, driving northbound on Longwood, stopped just south of West Adams Boulevard.  An individual, holding a gun, emerged from the front passenger seat, walked north on Longwood, turned the corner onto Adams and walked toward the liquor store with the gun up.  The individual fired toward the store.  Hall and Perkins, who were standing outside the liquor store, dove to the ground.  Hall crawled back inside the liquor store.  Perkins, hiding behind a parked car, returned fire with his own weapon.

As shots were fired, Abel Montana and Gabriel Olivares were sitting in Montana's Honda SUV, which was parked on Adams near Holiday Liquor.  Olivares, sitting in the front passenger seat, turned and saw a man standing two or three feet behind the SUV shooting toward the liquor store.  Montana also saw a man on the sidewalk pointing a gun toward them.  (Olivares described the shooter he saw as a tall, stocky Black man with heavy facial hair, including a mustache and goatee, wearing baggy jeans, dark clothing and a hoodie.  Montana described the gunman he saw as Black, between five feet eight inches and six feet tall, wearing dark pants and possibly a sweater.)  Just as Montana and Olivares began to drive from the area (heading eastbound on Adams, toward the liquor store), the rear passenger side window of the SUV shattered.  Both Montana and Olivares were shot:  Montana in the right elbow; Olivares on the tip of his nose.

After firing toward the SUV, the gunman walked back on Adams toward Longwood.  As he reached the corner, he turned and appeared to fire again before running south on Longwood.  The Chrysler Pacifica then drove south on Longwood way from the area.

When police officers responded to the scene, they found Hall sitting outside the liquor store on the sidewalk with a gunshot wound to his left forearm.  Perkins had been shot in his right knee.

During his investigation Detective Lane created a crime flyer that included two full-body images of the suspected shooter taken from the liquor store surveillance footage and a photograph of a 2007 Chrysler Pacifica.  On July 16, 2018 Detective Lane interviewed Payne, who was in custody on an unrelated matter.  Detective Lane showed Payne the crime flyer.  Payne acknowledged it was his photograph.  Payne also said he had the same vehicle as depicted in the flyer.

2. *The Preliminary Hearing*

Payne elected to represent himself at his preliminary hearing.  Court-appointed standby counsel, Paul Cohen, was also present in the courtroom.

At the outset of the hearing the court asked Payne if he had a motion to exclude witnesses.  Payne responded, "May I have a moment to speak with my counsel?"  The court replied, "You can't speak with standby counsel during the course of the preliminary hearing."  Payne then answered, "No."  The prosecutor subsequently asked the court to exclude witnesses, and the court granted the motion, as well as the motion to designate Detective Lane as the People's investigating officer.

Toward the end of the preliminary hearing, after the prosecutor had completed his presentation, the following exchange took place:

"The Court:  At this time, Mr. Payne, do you have any affirmative defense you would like to put on?  Meaning do you wish to call any witnesses?

"The Defendant: I don't wish to call any witnesses, but I would like to ask for a brief recess.

"The Court: No. I'm not going to grant a recess. But I'll let you argue, if you wish to argue. So, do you have any argument at this time?

"The Defendant: No, Your Honor. Self-argument, self-defense.

"The Court: Well you can argue that you were acting in self-defense.

"The Defendant: I want to argue that I was acting in self-defense."

Notwithstanding his statement, Payne did not present any argument at that point. The court then proceeded to find sufficient cause to hold Payne to answer and set bail at slightly more than $8 million.

3. *The Amended Information*

Shortly after the preliminary hearing and concurrently with the filing the original information on September 7, 2018, Payne informed the court he no longer wished to represent himself. Standby counsel Cohen was appointed to represent Payne.

The People filed an amended information November 1, 2018, charging Payne with the attempted murder of Hall, Perkins, Montana and Olivares (Pen. Code, §§ 187, subd. (a), 664)[1] (counts 1-4); shooting at an occupied vehicle (§ 246) (counts 7 and 8); possession of a firearm by a felon (§ 29800, subd. (a)(1)) (count 5); and carrying a loaded, unregistered

---

[1] Statutory references are to this code unless otherwise stated.

handgun (§ 25850, subd. (a)) (count 6). It was specially alleged as to the six counts charging Payne with attempted murder and shooting at an occupied vehicle that he had personally and intentionally discharged a firearm proximately causing great bodily injury within the meaning of section 12022.53, subdivision (d), and that as to each of those counts he had personally inflicted great bodily injury within the meaning of section 12022.7, subdivision (a). The amended information further alleged Payne had suffered a prior serious felony conviction within the meaning of the three strikes law (§§ 667, subds. (b)-(j), 1170.12) and section 667, subdivision (a).

4. *Trial*

Although both Hall and Perkins testified at trial, they each claimed they could not remember any details of the shooting and could not identify the shooter. Hall said he did not recall seeing Payne at the liquor store that evening and denied ever having seen him before. He also denied knowing Perkins.

Montana testified he was in "flight mode" as soon as he heard two shots fired. Looking through the right passenger window, where the sound had come from, Montana saw a man on the sidewalk pointing a gun directly at his SUV. The gun looked to Montana like a Glock (a semiautomatic firearm). Just as Montana pulled away from the curb, he was shot in the right arm.

Montana testified the gunshot that hit him came from the rear passenger side on the right. Asked how he knew that, Montana answered, "My windows have—they have gunshots in them." Montana did not get a good look at the shooter. Although he gave the detectives a description of the man, he was unable to identify him. Olivares's testimony was similar to Montana's. He,

7

too, identified the firearm as a semiautomatic and generally described the shooter, but was unable to identify him.

Detective Lane testified that he retrieved surveillance video from four camera angles from Holiday Liquor, as well as video from three different camera angles from the neighboring church, from which he "splic[ed] together the entirety of what happened." As the video was played for the jury, the detective summarized what he observed from the different camera angles.

After the court overruled defense counsel's objection as to foundation, Detective Lane identified Payne as the individual who left the green Chrysler Pacifica from the driver's seat. After a few additional questions and answers describing what was being shown on the video, the court held a sidebar conference with counsel and directed the prosecutor to establish the basis for Detective Lane's identification of Payne. Questioned on this point, Detective Lane explained he had been notified that someone in the holding cell possibly matched the person being sought for the shooting. Detective Lane "walked to the holding cell, looked inside and identified him as our shooting suspect." The detective continued, "Once I had his name, I pulled DMV photographs. And I used that to help me identify him as the shooter." The prosecutor inquired, "Would the court like anything further?" The court responded, "No."

Following Detective Lane's explanation of his identification of Payne, he continued his narration of the events depicted in response to questions from the prosecutor. After the detective described the shooting, the prosecutor asked, "You talked about this person, the shooter. Did you ultimately identify that shooter?" Detective Lane answered, "Yes." When the prosecutor then asked, "And who did you identify the shooter as," defense

counsel objected (although not stating any basis for the objection).  The court interjected, "Let's first indicate how and why that—I mean, that's just his opinion.  The jurors will make up their own mind whether or not he's correct."

Without any further objection the prosecutor asked, "Okay. How did you make that determination?"  Detective Lane then described how, looking at the surveillance video and observing Payne in the holding cell, he determined the man who emerged from the driver's seat of the Chrysler Pacifica was the same individual who came around the corner of West Adams and South Longwood and began shooting.

Detective Lane also described making the crime flyer with photographs taken from the surveillance videos (admitted as People's exhibit 2) and showing the flyer to Payne when interrogating him on July 16, 2018.  Detective Lane asked Payne if he recognized the person shown on the flyer.  Payne replied, "'Yeah.  That's me,' and . . . added, 'But I drink a lot.'"[2]  According to Detective Lane, Payne, when interviewed by the detective, "looked exactly like the person in the video, the shooter.  He had longer hair.  It was in the process of being, like dreadlocked.  He had a big, long goatee.  He's a big guy, I think six two, six three. At that time 250- to 280-pound range."  Detective Lane confirmed that Payne's booking photograph (admitted as People's exhibit 38) was an accurate depiction of what Payne looked like on July 16, 2018.  By the time of trial Payne's hair was short, and he was clean-shaven and appeared to have lost some weight.

---

[2]     The interview was recorded and played for the jury.

Explaining why he believed the shooter was the same individual as the driver of the Chrysler Pacifica (that is, Payne), Detective Lane testified, "You can see that the shooter has put on a dark-colored hoodie, but everything else is the same. He has a light-colored T-shirt, black pants. He has light boots, tan boots. You can see when he turns he's got a big goatee, which matches our defendant. . . . At one point the hoodie is not on. He's got big hair. He's got a big goatee. He's a big person. He's got the light-colored shirt, the dark pants, the light boots. And his build is very, very similar. So I was able to—he's wearing the exact same stuff as the person in the [prior] photo . . . . And that person we had a great face shot of, as you saw. That person ultimately ended up in custody at the station that I work at unrelated."

Payne did not testify in his defense. His girlfriend, Janae Thompson, testified Payne had been with her in Ontario, California, the entire weekend of May 12-13, 2018 (including the night of the shooting) and did not travel to Los Angeles. She also testified Payne did not have an operable car at that time and always shaved his face. When asked on cross-examination if she had told the defense investigator neither she nor Payne had cars, Thompson responded, "I did tell him I didn't have a car. And he asked me how do I get around. And I said Uber." She also testified she attended most of Payne's court proceedings, including the preliminary hearing, but thereafter added she had not been present when the prosecutor explained his theory of the case or heard the testimony of any witnesses.

5. *The Jury's Verdict and Sentencing*

The jury found Payne guilty on all eight charged offenses and found true all the special allegations. Payne waived his right to a bifurcated trial and admitted he had suffered a prior serious

felony conviction (voluntary manslaughter) as alleged in the amended information.

The trial court sentenced Payne on March 21, 2019 to an aggregate state prison sentence of 44 years plus 100 years to life. On count 1 the court sentenced Payne to the upper term of nine years for attempted murder, doubled to 18 years as a second strike, plus three years for the great bodily injury enhancement, doubled to six years, plus an indeterminate term of 25 years to life for the firearm-use enhancement. The court then imposed consecutive determinate terms for each of counts 2, 3 and 4 of six years eight months (one-third the middle term of seven years for attempted murder, doubled, plus one-third the three-year enhancement for inflicting great bodily injury, doubled), plus indeterminate terms of 25 years to life for the firearm-use enhancement on each count.[3]

Payne filed a notice of appeal the same day he was sentenced.

5. *Postjudgment Notice of Defense Counsel's Conflict*

Shortly after Payne was sentenced, both the prosecutor and Cohen notified the trial court that Cohen had a conflict of interest. At a hearing on April 4, 2019 at which Payne, Cohen and the prosecutor, as well as an attorney from the Los Angeles County Bar Association's independent defender program, were present, the prosecutor explained his office had charged Cohen on

---

[3] The court imposed the upper term of four years, doubled, on count 5, possession of a firearm by a felon, and ordered that sentence to run concurrently with the sentence on count 1. The court stayed the sentences it imposed on counts 6, 7 and 8 pursuant to section 654 and struck the five-year prior serious felony enhancement pursuant to section 667, subdivision (a).

July 12, 2018 with misdemeanor violations of the Los Angeles County Zoning and Building and Safety Codes "for unpermitted development or structures"—a storage shed in an undeveloped area of the county. The prosecutor added that he had been unaware of the charges against Cohen before March 29, 2019 (that is, after sentencing had occurred).

The prosecutor advised the court a notice of appeal had been filed, and Cohen reported Payne had retained private counsel for his appeal. The court stated no further action was necessary in superior court: "Since there is a notice of appeal and there is an appellate attorney and since everybody has got notice now of what any possible issue might be, it doesn't appear that any further appearances . . . are necessary in this court."

## DISCUSSION

1. *The Court at the Preliminary Hearing Did Not Deprive Payne of His Right To Counsel or Otherwise Err in Denying Payne the Opportunity To Consult with Standby Counsel*

Relying on language from a 1972 tentative draft of standards for trial judges from an American Bar Association project, Payne's original appellate counsel[4] argued the court, at Payne's preliminary hearing, prejudicially erred by denying Payne's request to speak to standby counsel. However, "a defendant who elects to represent himself or herself has no

_____

[4] After the case was fully briefed, Payne's retained appellate attorney moved to withdraw as counsel. We granted the motion and appointed new appellate counsel. We subsequently granted the new attorney's requests to augment the appellate record and authorized supplemental briefing by Payne and the Attorney General.

12

constitutional right to advisory or stand-by counsel or any other form of 'hybrid' representation." (*People v. Garcia* (2000) 78 Cal.App.4th 1422, 1430; see *People v. Moore* (2011) 51 Cal.4th 1104, 1119-1120, fn. omitted ["[A] defendant has no right, under either the federal or state Constitution, to 'hybrid representation.' Criminal defendants have the constitutional right to have an attorney represent them, and the right under the federal Constitution to represent themselves, but these rights are mutually exclusive"].)

Although Payne had no constitutional right to standby counsel, the Superior Court of Los Angeles County, Local Rules, rule 8.43(a) provides, "When a defendant is charged with a felony and is granted *pro per* status, the court shall appoint standby counsel within ten days after the arraignment on the information or indictment, or as soon thereafter as practicable." However, rule 8.43(b) cautions, "Except at the request of the court, standby counsel does not act as advisory counsel nor provide the defendant with legal advice. Standby counsel is expected to take over the trial in the event that the defendant's *pro per* status is revoked or relinquished."

The court did not err by enforcing rule 8.43(b)'s limitation on the role of standby counsel. (See *People v. Williams* (2013) 58 Cal.4th 197, 255 ["'standby counsel . . . *takes no active role in the defense*, but attends the proceedings so as to be familiar with the case in the event that the defendant gives up or loses his or her right to self-representation'"]; *People v. Kurbegovic* (1982) 138 Cal.App.3d 731, 757 ["the term 'standby' counsel generally relates to an attorney's being present to step in and represent an individual no longer able to represent himself"]; see also *People v. Harrison* (2013) 215 Cal.App.4th 647, 656 [explaining difference

between standby counsel and advisory counsel and holding, when a self-represented defendant in a noncapital case "has not requested advisory counsel, the trial court is under no obligation to appoint one sua sponte"].)

In addition, as the Attorney General points out, Payne requested to speak with standby counsel when the court asked if Payne wanted to move to exclude prospective witnesses during testimony at the preliminary hearing. Because the court granted the prosecutor's motion to exclude all prospective witnesses after Payne declined to do so, any advice standby counsel might have given Payne on that point was moot. Payne fails to suggest any other possible prejudice (that is, affecting the outcome of the preliminary hearing) that could have resulted from his inability to speak to standby counsel. (See Cal. Const., art. VI, § 13 [prohibiting reversal of a judgment unless the error has resulted in a "miscarriage of justice"]; *People v. Doolin* (2009) 45 Cal.4th 390, 420 ["'[a]ll trial court error under California law is governed by article VI, section 13 of the California Constitution'"].)

2. *The Trial Court Did Not Abuse Its Discretion in Permitting Detective Lane To Narrate the Surveillance Videos and Identify Payne as the Shooter*

Payne contends Detective Lane's narration of the surveillance videos from Holiday Liquor and the neighboring church, and in particular his identification of Payne as the driver of the Chrysler Pacifica when it first approached the liquor store and the individual who thereafter shot Hall and Perkins and the occupants of the SUV, should have been excluded as improper lay opinion testimony.[5] To the extent Detective Lane's testimony

---

[5] The Attorney General argues Payne forfeited the claim because defense counsel failed to timely object to Detective Lane's

14

explained how he combined the videos from two locations and seven cameras to develop a unified, coherent account of the crime and how what was depicted from one camera angle related to what was displayed from another, any opinions he may have expressed were rationally based on his perception and helpful to a clear understanding of his testimony and, therefore, properly admitted under Evidence Code section 800.  (See *People v. Leon* (2015) 61 Cal.4th 569, 601 (*Leon*) ["[a] lay witness may offer opinion testimony if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony"].)  Permitting Detective Lane to identify Payne as the shooter in the surveillance videos was also well within the trial court's discretion.  (See *id.* at p. 600 [ruling permitting identification of defendant from surveillance video is reviewed for abuse of discretion]; *People v. Thompson* (2016) 1 Cal.5th 1043, 1120 [as a general matter appellate courts "apply 'the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence'"].)

In *Leon, supra*, 61 Cal.4th 569 the Supreme Court held the identity of a person is a proper subject of nonexpert opinion (*id.*

---

testimony on this specific ground.  (See Evid. Code, § 353.)  Given defense counsel's initial objection and the extended discussions among the trial court, the prosecutor and defense counsel while Detective Lane was being examined concerning the surveillance videos, as well as the court's repeated directions to the prosecutor as to the manner in which the testimony should properly be elicited, we believe the issue is properly before us.  (See *People v. Champion* (1995) 9 Cal.4th 879, 908, fn. 6 ["[b]ecause the question whether defendants have preserved their right to raise this issue on appeal is close and difficult, we assume [they] have preserved their right, and proceed to the merits"].)

at p. 601) and affirmed the trial court's ruling permitting a detective to identify the defendant as the person shown on surveillance videos of two robberies. (*Ibid.* [courts "have long upheld admission of testimony identifying defendants in surveillance footage or photographs"].) The *Leon* Court expressly rejected as "a distinction without a difference" the defendant's contention, based on the facts of earlier court of appeal decisions, that the identification by the officer was improper because he had no familiarity with the defendant before the crime occurred, meeting him for the first time after his arrest: "It is undisputed [the detective] was familiar with defendant's appearance around the time of the crimes. Their contact began when defendant was arrested, one day after the Valley Market robbery. Questions about the extent of [the detective's] familiarity with defendant's appearance went to the weight, not the admissibility, of his testimony." (*Ibid.*)

Further explaining its ruling, the Supreme Court noted the detective's identification was helpful to the jury because "[w]itnesses who identified defendant in lineups held many months after the crimes noted that defendant was heavier, had shorter hair, and no longer wore a mustache." (*Leon, supra*, 61 Cal.4th at p. 601.) In addition, "because the surveillance video was played for the jury, jurors could make up their own minds about whether the person shown was defendant." (*Ibid.*) The Court concluded, "Because [the detective's] testimony was based on his relevant personal knowledge and aided the jury, the court did not abuse its discretion by admitting it." (*Ibid.*)

Attempting to distinguish *Leon*, Payne points out that his arrest and interview with Detective Lane took place approximately two months after the shooting outside Holiday

16

Liquor, while the *Leon* defendant had been arrested the day after the second of the two robberies.  But as the Supreme Court explained, the extent of the detective's familiarity with the defendant, and therefore the accuracy of his identification, went to the weight, not the admissibility of the testimony.  (*Leon*, *supra*, 61 Cal.4th at p. 601.)  As in *Leon*, the video was played for the jury, which could evaluate for itself whether the shooter was Payne, as the trial court expressly stated during Detective Lane's testimony.  In addition, Detective Lane testified Payne had changed his appearance by the time of trial (he was clean-shaven and had lost weight), as had the suspect in *Leon*; and Payne's booking photograph was in evidence, so the jury was also able to evaluate whether Payne in July 2018, when Detective Lane first met him, looked similar to, or different from, the suspect in the surveillance videos.  Finally, Detective Lane's identification was confirmed by Payne himself, who acknowledged the photographs on the crime flyer, taken from the surveillance videos, were of him.

### 3. *The Trial Court Did Not Abuse Its Discretion in Admitting Payne's Preliminary Hearing Statement Concerning Self-defense*

Over Payne's objection the prosecution read to the jury Payne's statement at his preliminary hearing, where he was representing himself, that he wanted to argue he had been acting in self-defense (although no such argument was made).[6]  On

---

[6]	Defense counsel argued Payne likely did not understand what he was saying, pointing out Payne had initially said, "Self-argument.  Self-defense"; asserted it was not reasonable to infer Payne intended to concede he had been at the scene and fired his gun but that someone had shot at him first; and complained, "I don't see how it—it's right that it should come back to bite him."

appeal Payne contends the trial court abused its discretion under Evidence Code section 352 by admitting the statement into evidence, arguing it was not clear what Payne was talking about since he initially referred to "self-argument" and presented no defense of any sort at the preliminary hearing, thereby severely limiting the probative value of the statement, and the inference that Payne thereby admitted he was the shooter was substantially more prejudicial than probative.

Payne's argument misapprehends the broad scope of the trial court's discretion under Evidence Code section 352 and the nature of the undue prejudice that justifies excluding otherwise relevant evidence. (See *People v. Clark* (2016) 63 Cal.4th 522, 586 ["'Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time.' [Citation.] 'A trial court's discretionary ruling under Evidence Code section 352 will not be disturbed on appeal absent an abuse of discretion'"]; *People v. Tran* (2011) 51 Cal.4th 1040, 1047 ["'[e]vidence is substantially more prejudicial than probative [citation] [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome"'"].) "The circumstance that evidence is adverse to a defendant's case does not render it prejudicial within the meaning of section 352. [Citation.] In applying this statute we evaluate the 'risk of *undue* prejudice,

---

Although not actually cited by counsel, we interpret his somewhat unartful objection as contending the probative value of the statement was substantially outweighed by the danger it would create undue prejudice within the meaning of Evidence Code section 352.

18

that is, "'evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues,'" not the prejudice "that naturally flows from relevant, highly probative evidence'"" (*People v. Salcido* (2008) 44 Cal.4th 93, 148.)

Contrary to defense counsel's contention, Payne's statement at the preliminary hearing that he wished to argue self-defense, while certainly ill-advised, was not entirely irrational or misleading. After all, there was evidence from the surveillance videos that Perkins had fired his weapon. Payne's statement was relevant within the meaning of Evidence Code section 210 (it tended to prove a disputed fact of consequence) and admissible notwithstanding the hearsay rule as a party admission under Evidence Code section 1220. And the prejudice to Payne from admitting the statement was its tendency to prove his guilt—damage that flowed from the reason the statement was relevant, not because it would inflame the emotions of the jury. (See *People v. McCurdy* (2014) 59 Cal.4th 1063, 1098 ["[e]vidence is prejudicial within the meaning of Evidence Code section 352 if it uniquely tends to evoke an emotional bias against a party as an individual [citations] or if it would cause the jury to prejudg[e] a person or cause on the basis of extraneous factors," internal quotation marks omitted]; *People v. Cowan* (2010) 50 Cal.4th 401, 475 [same]; see also *People v. Riggs* (2008) 44 Cal.4th 248, 290 ["'[e]vidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome"'"].) There was no abuse of discretion in admitting Payne's statement.

4. *The Prosecutor's Comments in Closing Argument Concerning Inconsistencies in Thompson's Testimony Did Not Constitute Misconduct*

During his initial closing argument the prosecutor attacked Thompson's credibility, identifying several inconsistencies in her testimony, labeling it as "the changing narrative of the defendant's story about what happened and where he was and what he did," and concluding, "Ultimately, what she fed you [was] a load of lies." Payne contends the prosecutor misrepresented aspects of Thompson's testimony, creating inconsistencies where none existed, and asserts the argument constituted prejudicial misconduct. Payne focuses on what he asserts were two specific misstatements—that Thompson had falsely told the defense investigator neither she nor Payne owned cars and that she testified she had attended all pretrial hearings but later claimed she was not present at the preliminary hearing when witnesses testified or a separate hearing at which the prosecutor explained his theory of the case.

Even if this issue were not forfeited because Payne neither objected to the closing argument nor requested a curative admonition (see, e.g., *People v. Charles* (2015) 61 Cal.4th 308, 327 [""'[t]o preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument"'"]; *People v. Williams* (2013) 58 Cal.4th 197, 274 [same]),[7] the prosecutor's challenge to the believability of

_____

[7] The forfeiture doctrine does not apply when an objection would have been futile or a request for an admonition would not have cured the harm (see *People v. Seumanu* (2015) 61 Cal.4th 1293, 1328-1329). Payne points to nothing in the record that

Thompson's testimony was a fair comment on the evidence. (See *People v. Edwards* (2013) 57 Cal.4th 658, 736 ["[a] prosecutor's 'argument may be vigorous as long as it is a fair comment on the evidence, which can include reasonable inferences or deductions to be drawn therefrom'"]; *People v. Hill* (1998) 17 Cal.4th 800, 823 [same].)

As to the first purported misstatement, the thrust of the prosecutor's comment was not that Thompson had significantly changed her story from what she told the defense investigator (whether Payne did not have a car, meaning he did not own one, or his car was not in working condition, as Thompson testified at trial, is hardly a material distinction), but that Thompson was including details in her narrative to bolster Payne's alibi. (The prosecutor told the jury, "She threaded the needle as best as she could to create a story that would minimize the defendant's liability in this case," and observed that adding Payne had driven his grandmother's car the weekend of the shooting, rather than his Chrysler Pacifica, was "kind of a strange thing to raise.") Even if slightly inaccurate (because Thompson's description would tend to exculpate Payne), the prosecutor's comment concerning this aspect of Thompson's testimony does not constitute ""'the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury'"" necessary for a finding of prosecutorial error justifying reversal of a conviction because it rendered the criminal trial fundamentally unfair. (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1331-1332; cf. *People v. Redd* (2010) 48 Cal.4th 691, 742 ["'[i]t is, of

suggests it would have been futile for defense counsel to object or request that the court admonish the jury to address any perceived mischaracterization of Thompson's testimony.

course, improper to make arguments to the jury that give it the impression that "emotion may reign over reason," and to present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response"""].)

Similarly, the prosecutor's insistence that it was unreasonable for Thompson to testify she had attended all of Payne's court proceedings, but then to deny she had been present when the prosecutor explained the theory of the case or at the portion of the preliminary hearing where witnesses testified, was part of his explanation that she knew the case against Payne and tailored her story of his alibi to fit those facts. Although Thompson testified she had attended most, but not all, of the pretrial hearings, she did acknowledge being present at the preliminary hearing while insisting she had not heard any explanation of the People's case or any witnesses testify. The slight variance between Thompson's actual testimony and the prosecutor's summary falls far short of being deceptive or reprehensible.[8]

---

[8] Because we conclude the challenged comments did not constitute prosecutorial misconduct, we need not address Payne's argument defense counsel was ineffective for failing to object. (See *People v. Thompson* (2010) 49 Cal.4th 79, 122 ["[c]ounsel is not ineffective for failing to make frivolous or futile motions"]; *People v. Cudjo* (1993) 6 Cal.4th 585, 616 [counsel's failure to object cannot constitute ineffective assistance when there was no sound legal basis for an objection].) We note, however, that defense counsel responded to the prosecutor's comments during his closing argument, emphasizing that the prosecutor had not called the defense investigator to testify about Thompson's alleged inconsistent statements—suggesting he had a tactical reason for choosing not to object. (See generally *People v.*

5. *Substantial Evidence Supported Two Convictions for Shooting at an Occupied Vehicle*

   a. *Procedural background*

Section 246 provides, "Any person who shall maliciously and willfully discharge a firearm at an inhabited dwelling house, occupied building, occupied motor vehicle . . . is guilty of a felony." As discussed, Payne was charged with two counts of violating section 246: Counts 7 and 8 of the amended information alleged in identical language, "On or about May 13, 2018, in the County of Los Angeles, the crime of shooting at occupied motor vehicle, in violation of Penal Code section 246, a felony, was committed by Kevin Anthony Payne, Jr., who did willfully, unlawfully, and maliciously discharge a firearm at an occupied motor vehicle." (Nonstandard capital letters omitted.) No individual was identified as a victim of either offense.

The trial court instructed the jury with CALCRIM No. 965, advising the jury Payne was charged in counts 7 and 8 with shooting at an occupied vehicle. The instruction continued, "To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant willfully and maliciously shot a firearm. [¶] 2. The defendant shot the firearm at an occupied motor vehicle; [¶] AND [¶] 3. The defendant did not act in self-defense." As was true with the amended information, the instruction did not indicate there was a victim for either offense, and the court did not include an explanation why there were two

_____

*Gamache* (2010) 48 Cal.4th 347, 391 [on a direct appeal a conviction will be reversed for ineffective assistance of counsel only when the record demonstrates there could have been no rational tactical purpose for counsel's challenged act or omission]; *People v. Anderson* (2001) 25 Cal.4th 543, 569 [same].)

counts of violating section 246 and what was necessary for the People to prove both counts.

In his closing argument the prosecutor told the jury, "The defendant is charged with two counts of shooting at an occupied motor vehicle. He's charged with two counts because there were two individuals, two victims seated in Gabriel Olivares's Honda Passport. Gabriel Olivares and Abel Montana. I apologize. I meant Abel Montana's Honda Passport." However, the prosecutor continued, "You saw from the video that, as the defendant leaned over, he fired several times." Elsewhere in his argument the prosecutor again indicated more than one shot had been fired in the direction of the SUV, stating Payne had fired "those rounds at Abel Montana and Gabriel Olivares, striking both of them."

The verdict forms provided to the jury for counts 7 and 8 simply described the offense as shooting at an occupied motor vehicle, again without identifying a victim. However, the firearm-use and great bodily injury sentencing enhancements for count 7 referred to Montana and for count 8 referred to Olivares. The jury found those enhancements true on both counts.

b. *Two counts with one shot and two occupants*

On appeal Payne argues he was wrongfully convicted on two counts of violating section 246 based on the presence of two individuals in the vehicle. In support of this argument Payne relies on *Wilkoff v. Superior Court* (1985) 38 Cal.3d 345, which held one instance of drunk driving is chargeable as only one count of felony drunk driving "even if more than one person is injured thereby." (*Id.* at p. 349.) The Supreme Court explained, "[A] charge of multiple counts of violating a statute is appropriate only when the actus reus prohibited by the statute—the

gravamen of the offense—has been committed more than once. The act prohibited by [Vehicle Code] section 23153 is the act of driving a vehicle while intoxicated and, when so driving, violating any law in relation to the driving of a vehicle." (*Ibid.*) Later in its opinion, the Court reiterated, "A defendant may properly be convicted of multiple counts for multiple victims of a single criminal act only where the act prohibited by the statute is centrally an 'act of violence against the person.'" (*Id.* at p. 351.) Shooting at an occupied vehicle may have deadly consequences, but, Payne contends, it is not primarily an act of violence against the person.

The Attorney General disagrees, arguing, because the actus reus prohibited by section 246 involves a violent act against the person, a single shot at a vehicle occupied by two people is properly the basis for two convictions. In support he cites *People v. Hansen* (1994) 9 Cal.4th 300, 309-310, which held the willful discharge of a firearm at an inhabited dwelling is an inherently dangerous felony for purposes of the second degree felony-murder rule, and this court's decision in *People v. Cruz* (1995) 38 Cal.App.4th 427, 434, which held the defendant was properly sentenced for both an aggravated assault and discharging a firearm at an occupied building based on having fired four shots at a security officer who was standing in front of an occupied building together with "'children and other people.'" We explained the security guard was a victim of both crimes, but the children and other individuals "were at risk from bullets and flying glass" and thus were also victims of the second crime, justifying the imposition of (concurrent) sentences for both offenses without violating section 654.

Neither of these cases is particularly helpful to the Attorney General's position. Much more to the point is *People v Overman* (2005) 126 Cal.App.4th 1344, which held section 246 "proscribes shooting *either* directly at *or* in close proximity to an inhabited or occupied target under circumstances showing a conscious disregard for the probability that one or more bullets will strike the targets or persons in or around it." (*Id.* at p. 1356.)[9] In reaching this result, the *Overman* court explained section 246 is a general intent crime and its focus is not commission of a violent act against a person: "Section 246 does not require a specific intent "'to do a further act or achieve a future consequence'" beyond the proscribed act of shooting 'at' an occupied building or other proscribed target. [Citation.] In other words, the statute does not require a specific intent to achieve a particular result (e.g., strike an inhabited or occupied target, kill or injure)." (*Overman*, at p. 1357.) Similarly, in *In re Daniel R.* (1993) 20 Cal.App.4th 239 we held, "[T]he gravamen of a section 246 violation is firing at the occupied vehicle. While the potential for injury to persons is implied in the statutory requirement the vehicle be occupied, the probability of injury is not the primary focus of the crime unlike an assault with a deadly weapon." (*Id.* at p. 246, fn. omitted.)

That section 246 is properly interpreted as not primarily prohibiting an "'act of violence against the person'" is reinforced by the Supreme Court's decision in *People v. Rodriguez* (1986)

---

[9] *People v. Overman, supra,* 126 Cal.App.4th 1344 and *People v. Chavira* (1970) 3 Cal.App.3d 988, which similarly held section 246 was violated by shooting in close proximity to a proscribed target, were cited with approval in *People v. Manzo* (2012) 53 Cal.4th 880, 888.

42 Cal.3d 1005, 1018, which held section 246 was violated by shooting at an "inhabited dwelling house" if there were permanent residents of the building even though no one was present at the time of the crime. (See also *People v. Manzo* (2012) 53 Cal.4th 880, 886 [explaining that the 1976 amendment to section 246 "was intended to strengthen the law prohibiting discharge of a firearm at a motor vehicle, which at that time required (for felony purposes) a showing the shooter intended to cause great bodily harm"; "[t]he bill's supporters believed that the act of discharging a firearm at an occupied vehicle, even in the absence of an intent to cause great bodily harm, was serious enough to warrant felony punishment"].)

In sum, we agree with Payne that maliciously and willfully discharging a firearm only once at an occupied vehicle is a single offense regardless of the number of occupants of the vehicle. As was true in *Wilkoff v. Superior Court*, *supra*, 38 Cal.3d at page 352, "[t]he actus reus of the offense does not include causing bodily injury." That conclusion, however, does not resolve the question whether Payne was wrongfully convicted on two counts of violating section 246.

> c. *Two counts with two shots (regardless of the number of occupants)*

Although the prosecutor at one point argued (incorrectly) Payne was guilty on two counts of shooting at an occupied vehicle because both Montana and Olivares were in the SUV (and both suffered great bodily injury as a result), the prosecutor repeatedly pointed to evidence that Payne had fired several times at the SUV, shooting "those rounds" at the vehicle. That summary of the evidence was supported by muzzle flashes visible on the surveillance videos, as well as Montana's testimony the windows

27

of his SUV had "gunshots"—plural—in them, not just a single bullet hole. As the Attorney General argues, Payne's assertion in his opening brief that "[t]he gravamen of the offense was committed only once" is not compelled by the evidence.

In his reply brief Payne does not dispute that firing two shots at an occupied vehicle will support two counts of violating section 246, but argues that was not the legal theory on which the case was tried, again quoting the prosecutor's comment that there were two counts because there were two victims. However, the trial court did not instruct the jury a single shot could be the basis for both counts 7 and 8;[10] and the prosecutor did not argue he only needed to prove a single shot had been fired by Payne to support a guilty verdict on both counts. To the contrary, as discussed, although the prosecutor emphasized there were two victims (necessary for the great bodily injury enhancements), he also described the evidence that multiple shots had been fired by Payne at the SUV. And nothing in the jury's verdict, unlike the situation described in *People v. McCoy* (2012) 208 Cal.App.4th 1333, 1339, cited by Payne, indicated it made specific findings that are inconsistent with a legally correct determination that Payne was guilty of two separate violations of section 246.

Additionally, in his discussion of the prosecutor's theory of the case, Payne omits any reference to the fact he was charged and convicted of the attempted murder of Montana and Olivares,

---

[10]     In *People v. Kunkin* (1973) 9 Cal.3d 245, 251, which Payne cites to support his argument, the Supreme Court held only that an appellate court cannot look to legal theories not included in the trial court's instructions to determine if substantial evidence supports the jury's verdict.

as well as Hall and Perkins.  As to those counts the trial court instructed, using CALCRIM No. 600, the People needed to prove "that the defendant not only intended to kill Henry Hall and Leamon Perkins, but also intended to kill Henry Hall, Leamon Perkins, Gabriel Olivares, and Abel Montana, or intended to kill everyone within the kill zone."  Discussing the video evidence in support of those counts, the prosecutor argued, "He knew he still had rounds in his gun when he turned over at Gabriel Olivares and Abel Montana and continued firing. . . .  He fires those last two to three shots sort of willy-nilly into the street as the cars are driving by.  The defendant is what you call an expert marksman here.  He hit four targets dead-on, four moving targets.  It's not easy firing a gun.  And [you] don't accidentally hit four people when you fire all these rounds."  Turning to  the firearm-use enhancements alleged in connection with the section 246 counts, as well as attempted murder, the prosecutor continued, "[T]he defendant did, in fact, personally discharge that weapon.  You see it in the videos.  You see him firing off multiple shots toward Holiday Liquor and then multiple shots toward the Honda Passport."  In sum, there can be no doubt the People's theory of the case—consistent with the trial court's instructions—was that Payne fired multiple shots at Montana's SUV.

Finally, while conceding in his reply brief multiple shots were fired during the May 13, 2018 incident, Payne also asserts in his reply brief there was no clear evidence he fired more than one shot at Montana's SUV.  Payne has forfeited this substantial evidence argument by not properly raising it in his opening brief. (See *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9; *People v. Harris* (2008) 43 Cal.4th 1269, 1290.)  But in any event, under the deferential standard of review when considering a claim of

29

insufficient evidence in a criminal case (see, e.g., *People v. Penunuri* (2018) 5 Cal.5th 126, 142), a finding Payne had fired multiple shots at the SUV was supported by Detective Lane's testimony and the surveillance videos.  Specifically, Detective Lane explained the video showed that the shooter turned toward the SUV followed by "muzzle flashes."  The prosecutor then asked whether the detective had ruled out other sources of the bullets that struck the SUV and wounded Montana and Gabriel.  Detective Lane responded affirmatively, testifying that, although the video showed Perkins had also fired shots as the SUV drove toward him, the location of the gunshot damage to the SUV and the nature of the injuries suffered by Montana and Gabriel (including the entry point of the bullet that hit Montana) "allowed me to rule out that the shots fired from Leamon Perkins were not the ones that caused the damage to the vehicle or their injuries, the occupants' injuries."

6. *Defense Counsel's Conflict Did Not Adversely Affect Payne's Defense*

"Both the United States Constitution and the California Constitution guarantee criminal defendants the right to the assistance of counsel unburdened by any conflicts of interest.  [Citation.]  Essentially, a claim of conflict of interest constitutes a form of ineffective assistance of counsel.  [Citations.]  In order to demonstrate a violation of the federal and state Constitutions based on a conflict of interest, a defendant must show that his or her counsel was burdened by an 'actual' conflict of interest—one that in fact adversely affected counsel's performance.  [Citation.]  When determining whether counsel's performance was "'adversely affected'" by the purported conflict under this standard, we consider whether "'counsel 'pulled his punches,' i.e.,

30

whether counsel failed to represent defendant as vigorously as he might have, had there been no conflict.'" [Citation.] This analysis will often turn on choices that a lawyer could have made, but did not make. In order to determine whether those choices resulted from the alleged conflict of interest, we must analyze the record to determine whether a lawyer who did not face the same conflict would have made different choices as well as whether counsel's choices were the product of tactical reasons rather than the alleged conflict of interest." (*People v. Perez* (2018) 4 Cal.5th 421, 435-436; see *People v. Doolin, supra*, 45 Cal.4th at p. 418 ["'[W]here a conflict of interest causes an attorney not to do something, the record may not reflect such an omission. We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission'"].)

Payne's trial counsel, who had been charged with misdemeanor violations of county zoning and building codes by the same entity that was prosecuting Payne, had a conflict of interest. (E.g., *Harris v. Superior Court* (2014) 225 Cal.App.4th 1129, 1138.) The Attorney General does not contend otherwise. However, the Attorney General argues, and we agree, Payne has failed to show defense counsel's performance was adversely affected by the conflict.

Payne argues defense counsel unburdened by a conflict would have properly (and successfully) objected to Detective Lane's identification of Payne as the shooter in the surveillance videos and the admission of his preliminary hearing statement that he wanted to argue he had acted in self-defense during the

31

May 13, 2018 incident. As discussed, however, the trial court did not prejudicially err in allowing Detective Lane's testimony and admitting into evidence Payne's preliminary hearing statement. Any purported failures by defense counsel with respect to those issues, whether tactical or not, did not adversely affect Payne's case. (See *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 309-310 ["[u]nder the federal precedents, which we have also applied to claims of conflict of interest under the California Constitution, a defendant is required to show that counsel performed deficiently and a reasonable probability exists that, but for counsel's deficiencies, the result of the proceeding would have been different"].) Similarly, because Payne was properly found guilty on two counts of shooting at an occupied vehicle, the suggestion defense counsel failed to vigorously assert Payne's rights in the trial court, for example by objecting to the prosecutor's remark there were two counts because there were two victims, did not prejudice Payne.

As we explain in the following section, defense counsel failed to recognize the trial court's sentencing errors in calculating and imposing the section 12022.7 great bodily injury enhancements. But the prosecutor made the same errors (in both his original and supplemental sentencing memoranda), as did the experienced trial judge; and Payne's original appellate counsel apparently did not identify the mistake because she did not raise it in her briefing. Under the circumstances defense counsel's deficient performance cannot reasonably be attributed to his purported divided loyalties, rather than to a lack of knowledge of the intricacies of sentencing law, shared by all other participants in the case.

7. *The Court Improperly Imposed the Great Bodily Injury Enhancement in Addition to the Section 12022.53, Subdivision (d), Firearm-use Enhancements*

On each of the attempted murder counts the trial court imposed the enhancement for personally and intentionally discharging a firearm proximately causing great bodily injury pursuant to section 12022.53, subdivision (d), and the great bodily injury enhancement pursuant to section 12022.7, subdivision (a). Section 12022.53, subdivision (f), however, provides, "An enhancement for great bodily injury as defined in Section 12022.7 . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to subdivision (d)." Accordingly, the great bodily injury enhancements must be stayed on counts 1 through 4. (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1129-1130 [trial court is to impose and stay execution of any additional enhancements covered by section 12022.53, subdivision (f)].)

In addition, as Payne argues and the Attorney General concedes, the trial court also erred in doubling the great bodily injury enhancements based on Payne's prior strike conviction. (*People v. Sok* (2010) 181 Cal.App.4th 88, 93-94 ["enhancements are added after the determination of the base term and are not doubled"]; *People v. Hardy* (1999) 73 Cal.App.4th 1429, 1433 ["[i]n sentencing a defendant who has one prior strike, the court may not double any enhancements it imposes"].) The correct term to be imposed and stayed is three years on count 1 and one year on counts 2 through 4.

8. *Payne Is Entitled To Be Resentenced in Accordance with the Requirements of Amended Section 1170*

Prior to January 1, 2022, section 1170, subdivision (b), provided in part: "When a judgment of imprisonment is to be

imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court. . . . The court shall select the term which, in the court's discretion, best serves the interests of justice." (See *People v. Sasser* (2015) 61 Cal.4th 1, 8; *People v. Estrada* (2020) 58 Cal.App.5th 839, 843.) As amended by Senate Bill 567, effective January 1, 2022, this provision now reads: "(1) When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2). [¶] (2) The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(1), (2).)

In addition, new section 1170, subdivision (b)(6), specifies, notwithstanding subdivision (b)(1), "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term" if any of a series of enumerated factors contributed to the commission of the crime, including the defendant had experienced psychological, physical or childhood trauma. (§ 1170, subd. (b)(6)(A).)[11]

_____

[11] Section 1170, subdivision (b)(7), provides, "Paragraph (6) does not preclude the court from imposing the lower term even if

34

As discussed, the trial court sentenced Payne to the upper term of nine years for the attempted murder charged in count 1 (based on section 664's five-, seven- or nine-year triad), which was then doubled under the three strikes law.  When imposing the upper term, the court explained, "[G]iven the multiple victims and the facts as came out in the trial of the indiscriminate shooting involved in this case at people, . . . this is a high term case."

Payne contends, and the Attorney General concedes, when Senate Bill 567 went into effect on January 1, 2022, Payne's judgment was not yet final[12] and the ameliorative aspects of the legislation apply retroactively to him.  (See *People v. Flores* (2021) 73 Cal.App.5th 1032, 1039 ["the amended version of section 1170, subdivision (b) . . . applies retroactively in this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal"]; see generally *People v. Esquivel* (2021) 11 Cal.5th 671, 674 ["'When the Legislature amends a statute so as to lessen the punishment[,] it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act.  It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply

there is no evidence of those circumstances listed in paragraph (6) present."

[12]      "'[F]or the purpose of determining the retroactive application of an amendment to a criminal statute, a judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed.'"  (*People v. Vieira* (2005) 35 Cal.4th 264, 306.)

to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final'"]; *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 307; *In re Estrada* (1965) 63 Cal.2d 740, 745.)

In his initial supplemental brief addressing Senate Bill 567, Payne argued, because one of the trial court's reasons for imposing the upper term was the "facts as they came out at trial"—facts that were neither found by the jury nor admitted by Payne—he was entitled to resentencing. The Attorney General argued in response that any error was harmless because the jury did find there were multiple victims, the court's other reason for imposing the upper term (it convicted Payne on four counts of attempted murder), and the evidence from the surveillance videos depicting Payne's indiscriminate shooting was so overwhelming that a jury unquestionably would have found that aggravating factor true.

In a further supplemental brief, which we permitted Payne to file after oral argument, he suggests, without citation of authority or substantive analysis, that the harmless error doctrine does not apply to his request for resentencing under the provisions of Senate Bill 567. He also argues for the first time that, because his probation report indicated in connection with his prior criminal history that he had been classified with the special handling code of "mentally disturbed," he may be entitled to a presumption under new section 1170, subdivision (b)(6), that the lower term on count 1 for attempted murder should have been imposed.

Payne's contention notwithstanding, the California Constitution mandates that we evaluate prejudice (harmless error) before reversing a judgment. (Cal. Const., art. VI, § 13 ["[n]o judgment shall be set aside, or new trial granted, in any cause . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice"]; *People v. Cahill* (1993) 5 Cal.4th 478, 511 ["in view of the language and history of the specific provision of the California Constitution governing the question of reversible error [citation], we conclude that a rule of automatic reversal is not warranted under California law"].) And there is at least some merit to the Attorney General's argument that any error in imposition of the upper term for attempted murder before Senate Bill 567's effective date was harmless.

Although, as Payne notes, there was no true finding regarding "indiscriminate shooting,"[13] a single factor in aggravation (multiple victims) established in a manner consistent with amended section 1170, subdivision (b) (and with *Cunningham v. California* (2007) 549 U.S. 270 and *Blakely v. Washington* (2004) 542 U.S. 296) would generally be sufficient to justify imposition of the upper term. (See *People v. Towne* (2008) 44 Cal.4th 63, 75; *People v. Quintanilla* (2009) 170 Cal.App.4th 406, 413.) However, because Payne has presented a plausible contention that new section 1170, subdivision (b)(6), may be applicable, we agree it is the better course to remand the cause

_____

[13] Contrary to the Attorney General's argument, the surveillance videos suggest Payne's shooting was not indiscriminate but instead targeted toward his intended victims (thus justifying the attempted murder convictions).

for the court to reconsider which term of the triad to impose on count 1.

## DISPOSITION

The convictions are affirmed.  The sentence is vacated, and the cause remanded with directions to the trial court to correct its previous errors and to resentence Payne in accordance with the terms of all applicable ameliorative legislation.

PERLUSS, P. J.

We concur:

SEGAL, J.

WISE, J.[*]

---

[*]    Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.